BLASIUS INDUSTRIES, INC., William B. Conner, Warren Delano, Jr., Harold H. George, Harold E. Hall, Michael A. Lubin, Arnold W. MacAlonan, Thomas J. Murnick, and William P. Shulevitz, Plaintiffs,

v.

ATLAS CORPORATION, John J. Dwyer, Edward R. Farley, Jr., Michael Bongiovanni, Richard R. Weaver, Walter G. Clinchy, Andrew Davlin, Jr., Edgar M. Masinter, John M. Devaney and Harry J. Winters, Jr., Defendants.

Civ. A. No. 9720.

Court of Chancery of Delaware, New Castle County.

Submitted: June 6, 1988.
Decided: July 25, 1988.

A. Gilchrist Sparks, III, and Michael Houghton of Morris, Nichols, Arsht & Tunnell, Wilmington, and Greg A. Danilow, M. Nicole Marcey, and Meric Craig Bloch, of Weil, Gotshal & Manges, and Linda C. Goldstein of Kramer, Levin, Nessen, Kamin & Frankel, New York City, for plaintiffs.

Charles F. Richards, Jr., Samuel A. Nolan, and Cynthia D. Kaiser of Richards, Layton & Finger, Wilmington, and Kenneth R. Logan, Joseph F. Tringali, David A. Martland, and Brad N. Friedman of

Simpson Thacher & Bartlett, New York City, for defendants.

## OPINION

ALLEN, Chancellor.

Two cases pitting the directors of Atlas Corporation against that company's largest (9.1%) shareholder, Blasius Industries, have been consolidated and tried together. Together, these cases ultimately require the court to determine who is entitled to sit on Atlas' board of directors. Each, however, presents discrete and important legal issues.

The first of the cases was filed on December 30, 1987. As amended, it challenges the validity of board action taken at a telephone meeting of December 31, 1987 that added two new members to Atlas' seven member board. That action was taken as an immediate response to the delivery to Atlas by Blasius the previous day of a form of stockholder consent that, if joined in by holders of a majority of Atlas' stock, would have increased the board of Atlas from seven to fifteen members and would have elected eight new members nominated by Blasius.

As I find the facts of this first case, they present the question whether a board acts consistently with its fiduciary duty when it acts, in good faith and with appropriate care, for the primary purpose of preventing or impeding an unaffiliated majority of shareholders from expanding the board and electing a new majority. For the reasons that follow, I conclude that, even though defendants here acted on their view of the corporation's interest and not selfishly, their December 31 action constituted an offense to the relationship between corporate directors and shareholders that has traditionally been protected in courts of equity. As a consequence, I conclude that the board action taken on December 31 was invalid and must be voided. The basis for this opinion is set forth at pages 658–663 below.

The second filed action was commenced on March 9, 1988. It arises out of the consent solicitation itself (or an amended

version of it) and requires the court to determine the outcome of Blasius' consent solicitation, which was warmly and actively contested on both sides. The vote was, on either view of the facts and law, extremely close. For the reasons set forth at pages 663–670 below, I conclude that the judges of election properly confined their count to the written "ballots" (so to speak) before them; that on that basis, they made several errors, but that correction of those errors does not reverse the result they announced. I therefore conclude that plaintiffs' consent solicitation failed to garner the support of a majority of Atlas shares.

The facts set forth below represent findings based upon a preponderance of the admissible evidence, as I evaluate it.

## I.

*Blasius Acquires a 9% Stake in Atlas.*

Blasius is a new stockholder of Atlas. It began to accumulate Atlas shares for the first time in July, 1987. On October 29, it filed a Schedule 13D with the Securities Exchange Commission disclosing that, with affiliates, it then owed 9.1% of Atlas' common stock. It stated in that filing that it intended to encourage management of Atlas to consider a restructuring of the Company or other transaction to enhance shareholder values. It also disclosed that Blasius was exploring the feasibility of obtaining control of Atlas, including instituting a tender offer or seeking "appropriate" representation on the Atlas board of directors.

Blasius has recently come under the control of two individuals, Michael Lubin and Warren Delano, who after experience in the commercial banking industry, had, for a short time, run a venture capital operation for a small investment banking firm. Now on their own, they apparently came to control Blasius with the assistance of Drexel Burnham's well noted junk bond mechanism. Since then, they have made several attempts to effect leveraged buyouts, but without success.

In May, 1987, with Drexel Burnham serving as underwriter, Lubin and Delano caused Blasius to raise $60 million through the sale of junk bonds. A portion of these funds were used to acquire a 9% position in Atlas. According to its public filings with the SEC, Blasius' debt service obligations arising out of the sale of the junk bonds are such that it is unable to service those obligations from its income from operations.

The prospect of Messrs. Lubin and Delano involving themselves in Atlas' affairs, was not a development welcomed by Atlas' management. Atlas had a new CEO, defendant Weaver, who had, over the course of the past year or so, overseen a business restructuring of a sort. Atlas had sold three of its five divisions. It had just announced (September 1, 1987) that it would close its once important domestic uranium operation. The goal was to focus the Company on its gold mining business. By October, 1987, the structural changes to do this had been largely accomplished. Mr. Weaver was perhaps thinking that the restructuring that had occurred should be given a chance to produce benefit before another restructuring (such as Blasius had alluded to in its Schedule 13D filing) was attempted, when he wrote in his diary on October 30, 1987:

> 13D by Delano & Lubin came in today. Had long conversation w/MAH & Mark Golden [of Goldman, Sachs] on issue. All agree we must dilute these people down by the acquisition of another Co. w/stock, or merger or something else.

*The Blasius Proposal of A Leverage Recapitalization Or Sale.*

Immediately after filing its 13D on October 29, Blasius' representatives sought a meeting with the Atlas management. Atlas dragged its feet. A meeting was arranged for December 2, 1987 following the regular meeting of the Atlas board. Attending that meeting were Messrs. Lubin and Delano for Blasius, and, for Atlas, Messrs. Weaver, Devaney (Atlas' CFO), Masinter (legal counsel and director) and Czajkowski (a representative of Atlas' investment banker, Goldman Sachs).

At that meeting, Messrs. Lubin and Delano suggested that Atlas engage in a leveraged restructuring and distribute cash to shareholders. In such a transaction, which is by this date a commonplace form of transaction, a corporation typically raises cash by sale of assets and significant borrowings and makes a large one time cash distribution to shareholders. The shareholders are typically left with cash and an equity interest in a smaller, more highly leveraged enterprise. Lubin and Delano gave the outline of a leveraged recapitalization for Atlas as they saw it.

Immediately following the meeting, the Atlas representatives expressed among themselves an initial reaction that the proposal was infeasible. On December 7, Mr. Lubin sent a letter detailing the proposal. In general, it proposed the following: (1) an initial special cash dividend to Atlas' stockholders in an aggregate amount equal to (a) $35 million, (b) the aggregate proceeds to Atlas from the exercise of option warrants and stock options, and (c) the proceeds from the sale or disposal of all of Atlas' operations that are not related to its continuing minerals operations; and (2) a special non-cash dividend to Atlas' stockholders of an aggregate $125 million principal amount of 7% Secured Subordinated Gold–Indexed Debentures. The funds necessary to pay the initial cash dividend were to principally come from (i) a "gold loan" in the amount of $35,625,000, repayable over a three to five year period and secured by 75,000 ounces of gold at a price of $475 per ounce, (ii) the proceeds from the sale of the discontinued Brockton Sole and Plastics and Ready–Mix Concrete businesses, and (iii) a then expected January, 1988 sale of uranium to the Public Service Electric & Gas Company. (DX H.)

*Atlas Asks Its Investment Banker to Study the Proposal.*

This written proposal was distributed to the Atlas board on December 9 and Goldman Sachs was directed to review and analyze it.

The proposal met with a cool reception from management. On December 9, Mr. Weaver issued a press release expressing surprise that Blasius would suggest using debt to accomplish what he characterized as a substantial liquidation of Atlas at a time when Atlas' future prospects were promising. He noted that the Blasius proposal recommended that Atlas incur a high debt burden in order to pay a substantial one time dividend consisting of $35 million in cash and $125 million in subordinated debentures. Mr. Weaver also questioned the wisdom of incurring an enormous debt burden amidst the uncertainty in the financial markets that existed in the aftermath of the October crash.

Blasius attempted on December 14 and December 22 to arrange a further meeting with the Atlas management without success. During this period, Atlas provided Goldman Sachs with projections for the Company. Lubin was told that a further meeting would await completion of Goldman's analysis. A meeting after the first of the year was proposed.

*The Delivery of Blasius' Consent Statement.*

On December 30, 1987, Blasius caused Cede & Co. (the registered owner of its Atlas stock) to deliver to Atlas a signed written consent (1) adopting a precatory resolution recommending that the board develop and implement a restructuring proposal, (2) amending the Atlas bylaws to, among other things, expand the size of the board from seven to fifteen members—the maximum number under Atlas' charter, and (3) electing eight named persons to fill the new directorships. Blasius also filed suit that day in this court seeking a declaration that certain bylaws adopted by the board on September 1, 1987 acted as an unlawful restraint on the shareholders' right, created by Section 228 of our corporation statute, to act through consent without undergoing a meeting.

The reaction was immediate. Mr. Weaver conferred with Mr. Masinter, the Company's outside counsel and a director, who viewed the consent as an attempt to take control of the Company. They decided to call an emergency meeting of the board, even though a regularly scheduled meeting was to occur only one week hence, on Janu-

ary 6, 1988. The point of the emergency meeting was to act on their conclusion (or to seek to have the board act on their conclusion) "that we should add at least one and probably two directors to the board ..." (Tr. 85, Vol. II). A quorum of directors, however, could not be arranged for a telephone meeting that day. A telephone meeting was held the next day. At that meeting, the board voted to amend the bylaws to increase the size of the board from seven to nine and appointed John M. Devaney and Harry J. Winters, Jr. to fill those newly created positions. Atlas' Certificate of Incorporation creates staggered terms for directors; the terms to which Messrs. Devaney and Winters were appointed would expire in 1988 and 1990, respectively.

*The Motivation of the Incumbent Board In Expanding the Board and Appointing New Members.*

 In increasing the size of Atlas' board by two and filling the newly created positions, the members of the board realized that they were thereby precluding the holders of a majority of the Company's shares from placing a majority of new directors on the board through Blasius' consent solicitation, should they want to do so. Indeed the evidence establishes that that was the principal motivation in so acting.

The conclusion that, in creating two new board positions on December 31 and electing Messrs. Devaney and Winters to fill those positions the board was principally motivated to prevent or delay the shareholders from possibly placing a majority of new members on the board, is critical to my analysis of the central issue posed by the first filed of the two pending cases. If the board in fact was not so motivated, but rather had taken action completely independently of the consent solicitation, which merely had an incidental impact upon the possible effectuation of any action authorized by the shareholders, it is very unlikely that such action would be subject to judicial nullification. *See, e.g., Frantz Manufacturing Company v. EAC Industries*, Del.Supr., 501 A.2d 401, 407 (1985); *Moran v. Household International, Inc.,* Del.Ch., 490 A.2d 1059, 1080, *aff'd,* Del. Supr., 500 A.2d 1346 (1985). The board, as a general matter, is under no fiduciary obligation to suspend its active management of the firm while the consent solicitation process goes forward.

There is testimony in the record to support the proposition that, in acting on December 31, the board was principally motivated simply to implement a plan to expand the Atlas board that preexisted the September, 1987 emergence of Blasius as an active shareholder. I have no doubt that the addition of Mr. Winters, an expert in mining economics, and Mr. Devaney, a financial expert employed by the Company, strengthened the Atlas board and, should anyone ever have reason to review the wisdom of those choices, they would be found to be sensible and prudent. I cannot conclude, however, that the strengthening of the board by the addition of these men was the principal motive for the December 31 action. As I view this factual determination as critical, I will pause to dilate briefly upon the evidence that leads me to this conclusion.

The evidence indicates that CEO Weaver was acquainted with Mr. Winters prior to the time he assumed the presidency of Atlas. When, in the fall of 1986, Mr. Weaver learned of his selection as Atlas' future CEO, he informally approached Mr. Winters about serving on the board of the Company. Winters indicated a willingness to do so and sent to Mr. Weaver a copy of his *curriculum vitae.* Weaver, however, took no action with respect to this matter until he had some informal discussion with other board members on December 2, 1987, the date on which Mr. Lubin orally presented Blasius' restructuring proposal to management. At that time, he mentioned the possibility to other board members.

Then, on December 7, Mr. Weaver called Mr. Winters on the telephone and asked him if he would serve on the board and Mr. Winters again agreed.

On December 24, 1987, Mr. Weaver wrote to other board members, sending them Mr. Winters *curriculum vitae* and notifying them that Mr. Winters would be

proposed for board membership at the forthcoming January 6 meeting. It was also suggested that a dinner meeting be scheduled for January 5, in order to give board members who did not know Mr. Winters an opportunity to meet him prior to acting on that suggestion. The addition of Mr. Devaney to the board was not mentioned in that memo, nor, so far as the record discloses, was it discussed at the December 2 board meeting.

It is difficult to consider the timing of the activation of the interest in adding Mr. Winters to the board in December as simply coincidental with the pressure that Blasius was applying. The connection between the two events, however, becomes unmistakably clear when the later events of December 30 and 31 are focused upon. As noted above, on the 30th, Atlas received the Blasius consent which proposed to shareholders that they expand the board from seven to fifteen and add eight new members identified in the consent. It also proposed the adoption of a precatory resolution encouraging restructuring or sale of the Company. Mr. Weaver immediately met with Mr. Masinter. In addition to receiving the consent, Atlas was informed it had been sued in this court, but it did not yet know the thrust of that action. At that time, Messrs. Weaver and Masinter "discussed a lot of [reactive] strategies and Edgar [Masinter] told me we really got to put a program together to go forward with this consent.... we talked about taking no action. We talked about adding one board member. We talked about adding two board members. We talked about adding eight board members. And we did a lot of looking at other and various and sundry alternatives...." (Weaver Testimony, Tr. I, p. 130). They decided to add two board members and to hold an emergency board meeting that very day to do so. It is clear that the reason that Mr. Masinter advised taking this step immediately rather than waiting for the January 6 meeting was that he feared that the Court of Chancery might issue a temporary restraining order prohibiting the board from increasing its membership, since the consent solicitation had commenced. It is admitted that there was no fear that Blasius would be in a position to complete a public solicitation for consents prior to the January 6 board meeting.

In this setting, I conclude that, while the addition of these qualified men would, under other circumstances, be clearly appropriate as an independent step, such a step was in fact taken in order to impede or preclude a majority of the shareholders from effectively adopting the course proposed by Blasius. Indeed, while defendants never forsake the factual argument that that action was simply a continuation of business as usual, they, in effect, admit from time to time this overriding purpose. For example, everyone concedes that the directors understood on December 31 that the effect of adding two directors would be to preclude stockholders from effectively implementing the Blasius proposal. Mr. Weaver, for example, testifies as follows:

Q: Was it your view that by electing these two directors, Atlas was preventing Blasius from electing a majority of the board?

A: I think that is a component of my total overview. I think in the short term, yes, it did.

Directors Farley and Bongiovanni admit that the board acted to slow the Blasius proposal down. *See* Tr. T, Vol. I, at pp. 23–24 and 81.

This candor is praiseworthy, but any other statement would be frankly incredible. The timing of these events is, in my opinion, consistent only with the conclusion that Mr. Weaver and Mr. Masinter originated, and the board immediately endorsed, the notion of adding these competent, friendly individuals to the board, not because the board felt an urgent need to get them on the board immediately for reasons relating to the operations of Atlas' business, but because to do so would, for the moment, preclude a majority of shareholders from electing eight new board members selected by Blasius. As explained below, I conclude that, in so acting, the board was not selfishly motivated simply to retain power.

There was no discussion at the December 31 meeting of the feasibility or wisdom of the Blasius restructuring proposal. While

several of the directors had an initial impression that the plan was not feasible and, if implemented, would likely result in the eventual liquidation of the Company, they had not yet focused upon and acted on that subject. Goldman Sachs had not yet made its report, which was scheduled to be given January 6.

*The January 6 Rejection of the Blasius Proposal.*

On January 6, the board convened for its scheduled meeting. At that time, it heard a full report from its financial advisor concerning the feasibility of the Blasius restructuring proposal. The Goldman Sachs presentation included a summary of five year cumulative cash flows measured against a base case and the Blasius proposal, an analysis of Atlas' debt repayment capacity under the Blasius proposal, and pro forma income and cash flow statements for a base case and the Blasius proposal, assuming prices of $375, $475 and $575 per ounce of gold.

After completing that presentation, Goldman Sachs concluded with its view that if Atlas implemented the Blasius restructuring proposal (i) a severe drain on operating cash flow would result, (ii) Atlas would be unable to service its long-term debt and could end up in bankruptcy, (iii) the common stock of Atlas would have little or no value, and (iv) since Atlas would be unable to generate sufficient cash to service its debt, the debentures contemplated to be issued in the proposed restructuring could have a value of only 20% to 30% of their face amount. Goldman Sachs also said that it knew of no financial restructuring that had been undertaken by a company where the company had no chance of repaying its debt, which, in its judgment, would be Atlas' situation if it implemented the Blasius restructuring proposal. Finally, Goldman Sachs noted that if Atlas made a meaningful commercial discovery of gold after implementation of the Blasius restructuring proposal, Atlas would not have the resources to develop the discovery.

The board then voted to reject the Blasius proposal. Blasius was informed of that action. The next day, Blasius caused a second, modified consent to be delivered to Atlas. A contest then ensued between the Company and Blasius for the votes of Atlas' shareholders. The facts relating to that contest, and a determination of its outcome, form the subject of the second filed lawsuit to be now decided. That matter, however, will be deferred for the moment as the facts set forth above are sufficient to frame and decide the principal remaining issue raised by the first filed action: whether the December 31 board action, in increasing the board by two and appointing members to fill those new positions, constituted, in the circumstances, an inequitable interference with the exercise of shareholder rights.

II.

Plaintiff attacks the December 31 board action as a selfishly motivated effort to protect the incumbent board from a perceived threat to its control of Atlas. Their conduct is said to constitute a violation of the principle, applied in such cases as *Schnell v. Chris Craft Industries,* Del. Supr., 285 A.2d 437 (1971), that directors hold legal powers subjected to a supervening duty to exercise such powers in good faith pursuit of what they reasonably believe to be in the corporation's interest. The December 31 action is also said to have been taken in a grossly negligent manner, since it was designed to preclude the recapitalization from being pursued, and the board had no basis at that time to make a prudent determination about the wisdom of that proposal, nor was there any emergency that required it to act in any respect regarding that proposal before putting itself in a position to do so advisedly.

Defendants, of course, contest every aspect of plaintiffs' claims. They claim the formidable protections of the business judgment rule. *See, e.g., Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1983); *Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1988); *In re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770 (1988).

They say that, in creating two new board positions and filling them on December 31, they acted without a conflicting interest

(since the Blasius proposal did not, in any event, challenge *their* places on the board), they acted with due care (since they well knew the persons they put on the board and did not thereby preclude later consideration of the recapitalization), and they acted in good faith (since they were motivated, they say, to protect the shareholders from the threat of having an impractical, indeed a dangerous, recapitalization program foisted upon them). Accordingly, defendants assert there is no basis to conclude that their December 31 action constituted any violation of the duty of the fidelity that a director owes by reason of his office to the corporation and its shareholders.

Moreover, defendants say that their action was fair, measured and appropriate, in light of the circumstances. Therefore, even should the court conclude that some level of substantive review of it is appropriate under a legal test of fairness, or under the intermediate level of review authorized by *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), defendants assert that the board's decision must be sustained as valid in both law and equity.

## III.

■ One of the principal thrusts of plaintiffs' argument is that, in acting to appoint two additional persons of their own selection, including an officer of the Company, to the board, defendants were motivated not by any view that Atlas' interest (or those of its shareholders) required that action, but rather they were motivated improperly, by selfish concern to maintain their collective control over the Company. That is, plaintiffs say that the evidence shows there was no policy dispute or issue that really motivated this action, but that asserted policy differences were pretexts for entrenchment for selfish reasons. If this were found to be factually true, one would not need to inquire further. The action taken would constitute a breach of duty. *Schnell v. Chris Craft Industries*, Del.Supr., 285 A.2d 437 (1971); *Guiricich v. Emtrol Corp.*, Del.Supr., 449 A.2d 232 (1982).

In support of this view, plaintiffs point to the early diary entry of Mr. Weaver (p. 653, *supra* ), to the lack of any consideration at all of the Blasius recapitalization proposal at the December 31 meeting, the lack of any substantial basis for the outside directors to have had any considered view on the subject by that time—not having had any view from Goldman Sachs nor seen the financial data that it regarded as necessary to evaluate the proposal—and upon what it urges is the grievously flawed, slanted analysis that Goldman Sachs finally did present.

While I am satisfied that the evidence is powerful, indeed compelling, that the board was chiefly motivated on December 31 to forestall or preclude the possibility that a majority of shareholders might place on the Atlas board eight new members sympathetic to the Blasius proposal, it is less clear with respect to the more subtle motivational question: whether the existing members of the board did so because they held a good faith belief that such shareholder action would be self-injurious and shareholders needed to be protected from their own judgment.

On balance, I cannot conclude that the board was acting out of a self-interested motive in any important respect on December 31. I conclude rather that the board saw the "threat" of the Blasius recapitalization proposal as posing vital policy differences between itself and Blasius. It acted, I conclude, in a good faith effort to protect its incumbency, not selfishly, but in order to thwart implementation of the recapitalization that it feared, reasonably, would cause great injury to the Company.

The real question the case presents, to my mind, is whether, in these circumstances, the board, even if it *is* acting with subjective good faith (which will typically, if not always, be a contestable or debatable judicial conclusion), may validly act for the principal purpose of preventing the shareholders from electing a majority of new directors. The question thus posed is not one of intentional wrong (or even negligence), but one of authority *as between the fiduciary and the beneficiary* (not simply

legal authority, *i.e.*, as between the fiduciary and the world at large).

## IV.

It is established in our law that a board may take certain steps—such as the purchase by the corporation of its own stock—that have the effect of defeating a threatened change in corporate control, when those steps are taken advisedly, in good faith pursuit of a corporate interest, and are reasonable in relation to a threat to legitimate corporate interests posed by the proposed change in control. *See Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985); *Kors v. Carey*, Del. Ch., 158 A.2d 136 (1960); *Cheff v. Mathes*, Del.Supr., 199 A.2d 548 (1964); *Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556 (1977). Does this rule—that the reasonable exercise of good faith and due care generally validates, in equity, the exercise of legal authority even if the act has an entrenchment effect—apply to action designed for the primary purpose of interfering with the effectiveness of a stockholder vote? Our authorities, as well as sound principles, suggest that the central importance of the franchise to the scheme of corporate governance, requires that, in this setting, that rule not be applied and that closer scrutiny be accorded to such transaction.

1. *Why the deferential business judgment rule does not apply to board acts taken for the primary purpose of interfering with a stockholder's vote, even if taken advisedly and in good faith.*

### A. *The question of legitimacy.*

The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests. Generally, shareholders have only two protections against perceived inadequate business performance. They may sell their stock (which, if done in sufficient numbers, may so affect security prices as to create an incentive for altered managerial performance), or they may vote to replace incumbent board members.

It has, for a long time, been conventional to dismiss the stockholder vote as a vestige or ritual of little practical importance.[1] It may be that we are now witnessing the emergence of new institutional voices and arrangements that will make the stockholder vote a less predictable affair than it has been. Be that as it may, however, whether the vote is seen functionally as an unimportant formalism, or as an important tool of discipline, it is clear that it is critical to the theory that legitimates the exercise of power by some (directors and officers) over vast aggregations of property that they do not own. Thus, when viewed from a broad, institutional perspective, it can be seen that matters involving the integrity of the shareholder voting process involve consideration not present in any other context in which directors exercise delegated power.

### B. *Questions of this type raise issues of the allocation of authority as between the board and the shareholders.*

The distinctive nature of the shareholder franchise context also appears when the matter is viewed from a less generalized, doctrinal point of view. From this point of view, as well, it appears that the ordinary considerations to which the business judgment rule originally responded are simply not present in the shareholder voting context.[2] That is, a decision by the

---

1. *See, e.g.,* E. Rostow, To Whom and For What Ends Is Corporate Management Responsible, in *The Corporation in Modern Society* (E.S. Mason ed.1959). The late Professor A.A. Berle once dismissed the shareholders' meeting as a "kind of ancient, meaningless ritual like some of the ceremonies that go with the mace in the House of Lords." Berle, Economic Power and the Free Society (1957), *quoted in* Balotti, Finkelstein, Williams, Meetings of Shareholders (1987) at 2.

2. Delaware courts have long exercised a most sensitive and protective regard for the free and effective exercise of voting rights. This concern suffuses our law, manifesting itself in various settings. For example, the perceived importance of the franchise explains the cases that hold that a director's fiduciary duty requires disclosure to shareholders asked to authorize a transaction of all material information in the corporation's possession, even if the transaction is not a self-dealing one. *See, e.g., Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985); *In re*

board to act for the primary purpose of preventing the effectiveness of a shareholder vote inevitably involves the question who, as between the principal and the agent, has authority with respect to a matter of internal corporate governance. That, of course, is true in a very specific way in this case which deals with the question who should constitute the board of directors of the corporation, but it will be true in every instance in which an incumbent board seeks to thwart a shareholder majority. A board's decision to act to prevent the shareholders from creating a majority of new board positions and filling them does not involve the exercise of *the corporation's power* over its property, or with respect to *its* rights or obligations; rather, it involves allocation, between shareholders as a class and the board, of effective power with respect to governance of the corporation. This need not be the case with respect to other forms of corporate action that may have an entrenchment effect—such as the stock buybacks present in *Unocal, Cheff* or *Kors v. Carey*. Action designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and a shareholder majority. Judicial review of such action involves a determination of the legal and equitable obligations of an agent towards his principal. This is not, in my opinion, a question that a court may leave to the agent finally to decide so long as he does so honestly and competently; that is, it may not be left to the agent's business judgment.[3]

2. *What rule does apply: per se invalidity of corporate acts intended primarily to thwart effective exercise of the franchise or is there an intermediate standard?*

■ Plaintiff argues for a rule of *per se* invalidity once a plaintiff has established that a board has acted for the primary purpose of thwarting the exercise of a shareholder vote. Our opinions in *Canada Southern Oils, Ltd. v. Manabi Exploration Co.*, Del.Ch., 96 A.2d 810 (1953) and *Condec Corporation v. Lunkenheimer Company*, Del.Ch., 230 A.2d 769 (1967) could be read as support for such a rule of *per se* invalidity. *Condec* is informative.

There, plaintiff had recently closed a tender offer for 51% of defendants' stock. It had announced no intention to do a follow-up merger. The incumbent board had earlier refused plaintiffs' offer to merge and, in response to its tender offer, sought alternative deals. It found and negotiated a proposed sale of all of defendants' assets for stock in the buyer, to be followed up by an exchange offer to the seller's shareholders. The stock of the buyer was publicly traded in the New York Stock Exchange, so that the deal, in effect, offered cash to the target's shareholders. As a condition precedent to the sale of assets, an ex-

---

*Anderson Clayton Shareholders' Litigation,* Del. Ch., 519 A.2d 669, 675 (1986).

A similar concern, for credible corporate democracy, underlies those cases that strike down board action that sets or moves an annual meeting date upon a finding that such action was intended to thwart a shareholder group from effectively mounting an election campaign. *See, e.g., Schnell v. Chris Craft, supra; Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906 (1980); *Aprahamian v. HBO,* Del.Ch., 531 A.2d 1204 (1987).

The cases invalidating stock issued for the primary purpose of diluting the voting power of a control block also reflect the law's concern that a credible form of corporate democracy be maintained. *See Canada Southern Oils, Ltd. v. Manabi Exploration Co., Inc.,* Del.Ch., 96 A.2d 810 (1953); *Condec Corporation v. Lunkenheimer Company,* Del.Ch., 230 A.2d 769 (1967); *Phillips v. Insituform of North America, Inc.,* Del.

Ch., C.A. No. 9173, Allen, C., 1987 WL 16285 (August 27, 1987).

Similarly, a concern for corporate democracy is reflected (1) in our statutory requirement of annual meetings (8 *Del.C.* § 211), and in the cases that aggressively and summarily enforce that right. *See, e.g., Coaxial Communications, Inc. v. CNA Financial Corp.,* Del.Supr., 367 A.2d 994 (1976); *Speiser v. Baker,* Del.Ch., 525 A.2d 1001 (1987), and (2) in our consent statute (8 *Del. C.* § 228) and the interpretation it has been accorded. *See Datapoint Corp. v. Plaza Securities Co.,* Del.Supr., 496 A.2d 1031 (1985) (order); *Allen v. Prime Computer, Inc.,* Del.Supr., No. 26, 1988 [538 A.2d 1113 (table) ] (Jan. 26, 1988); *Frantz Manufacturing Company v. EAC Industries,* Del.Supr., 501 A.2d 401 (1985).

**3.** I thus am unable to be guided by the somewhat different view expressed in the unreported case *American Rent-A-Car, Inc. v. Cross,* Del. Ch., C.A. No. 7583, 1984 WL 8204 (May 9, 1984).

change of authorized but unissued shares of the seller (constituting about 15% of the total issued and outstanding shares after issuance) was to occur. Such issuance would, of course, negate the effective veto that plaintiffs' 51% stockholding would give it over a transaction that would require shareholder approval. Plaintiff sued to invalidate the stock issuance.

The court concluded, as a factual matter, that: "... the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec...." 230 A.2d at 775. The court then implied that not even a good faith dispute over corporate policy could justify a board in acting for the primary purpose of reducing the voting power of a control shareholder:

> Nonetheless, I am persuaded on the basis of the evidence adduced at trial that the transaction here attacked unlike the situation involving the purchase of stock with corporate funds [the court having just cited *Bennett v. Propp*, Del.Supr., 187 A.2d 405, 409 (1962), and *Cheff v. Mathes*, Del.Supr., 199 A.2d 548 (1964)] was clearly unwarranted because it unjustifiably strikes at the very heart of corporate representation by causing a stockholder with an equitable right to a majority of corporate stock to have his right to a proportionate voice and influence in corporate affairs to be diminished by the simple act of an exchange of stock which brought no money into the Lunkenheimer treasury, was not connected with a stock option plan or other proper corporate purpose, and which was obviously designed for the primary purpose of reducing Condec's stockholdings in Lunkenheimer below a majority.

*Id.* at 777. A *per se* rule that would strike down, in equity, any board action taken for the primary purpose of interfering with the effectiveness of a corporate vote would have the advantage of relative clarity and predictability.[4] It also has the advantage of most vigorously enforcing the concept of corporate democracy. The disadvantage it brings along is, of course, the disadvantage a *per se* rule always has: it may sweep too broadly.

In two recent cases dealing with shareholder votes, this court struck down board acts done for the primary purpose of impeding the exercise of stockholder voting power. In doing so, a *per se* rule was not applied. Rather, it was said that, in such a case, the board bears the heavy burden of demonstrating a compelling justification for such action.

In *Aprahamian v. HBO & Company*, Del.Ch., 531 A.2d 1204 (1987), the incumbent board had moved the date of the annual meeting on the eve of that meeting when it learned that a dissident stockholder group had or appeared to have in hand proxies representing a majority of the outstanding shares. The court restrained that action and compelled the meeting to occur as noticed, even though the board stated that it had good business reasons to move the meeting date forward, and that that action was recommended by a special committee. The court concluded as follows:

> The corporate election process, if it is to have any validity, must be conducted with scrupulous fairness and without any advantage being conferred or denied to any candidate or slate of candidates. In the interests of corporate democracy, those in charge of the election machinery of a corporation must be held to the highest standards of providing for and conducting corporate elections. The business judgment rule therefore does not confer any presumption of propriety on the acts of directors in postponing the annual meeting. Quite to the contrary. When the election machinery appears, at least facially, to have been manipulated those in charge of the election have the burden of persuasion to justify their actions.

*Aprahamian*, 531 A.2d at 1206–07.

In *Phillips v. Insituform of North America, Inc.*, Del.Ch., C.A. No. 9173, Al-

---

**4.** While it must be admitted that any rule that requires for its invocation the finding of a subjective mental state (*i.e.*, a primary purpose) necessarily will lead to controversy concerning whether it applies or not, nevertheless, once it is determined to apply, this *per se* rule would be clearer than the alternative discussed below.

len, C. (Aug. 27, 1987), the court enjoined the voting of certain stock issued for the primary purpose of diluting the voting power of certain control shares. The facts were complex. After discussing *Canada Southern* and *Condec* in light of the more recent, important Supreme Court opinion in *Unocal Corp. v. Mesa Petroleum Company*, it was there concluded as follows:

> One may read *Canada Southern* as creating a black-letter rule prohibiting the issuance of shares for the purpose of diluting a large stockholder's voting power, but one need not do so. It may, as well, be read as a case in which no compelling corporate purpose was presented that might otherwise justify such an unusual course. Such a reading is, in my opinion, somewhat more consistent with the recent *Unocal* case.

\* \* \* \* \* \*

In applying the teachings of these cases, I conclude that no justification has been shown that would arguably make the extraordinary step of issuance of stock for the admitted purpose of impeding the exercise of stockholder rights reasonable in light of the corporate benefit, if any, sought to be obtained. Thus, whether our law creates an unyielding prohibition to the issuance of stock for the primary purpose of depriving a controlling shareholder of control or whether, as *Unocal* suggests to my mind, such an extraordi-

nary step might be justified in some circumstances, the issuance of the Leopold shares was, in my opinion, an unjustified and invalid corporate act.

*Phillips v. Insituform of North America, Inc., supra* at 23–24. Thus, in *Insituform*, it was unnecessary to decide whether a *per se* rule pertained or not.

In my view, our inability to foresee now all of the future settings in which a board might, in good faith, paternalistically seek to thwart a shareholder vote, counsels against the adoption of a *per se* rule invalidating, in equity, every board action taken for the sole or primary purpose of thwarting a shareholder vote, even though I recognize the transcending significance of the franchise to the claims to legitimacy of our scheme of corporate governance. It may be that some set of facts would justify such extreme action.[5] This, however, is not such a case.

3. *Defendants have demonstrated no sufficient justification for the action of December 31 which was intended to prevent an unaffiliated majority of shareholders from effectively exercising their right to elect eight new directors.*

■ The board was not faced with a coercive action taken by a powerful shareholder against the interests of a distinct shareholder constituency (such as a public minority). It was presented with a consent

---

5. Imagine the facts of *Condec* changed very slightly and coming up in today's world of corporate control transactions. Assume an acquiring company buys 25% of the target's stock in a small number of privately negotiated transactions. It then commences a public tender offer for 26% of the company stock at a cash price that the board, in good faith, believes is inadequate. Moreover, the acquiring corporation announces that it may or may not do a second-step merger, but if it does one, the consideration will be junk bonds that will have a value, when issued, in the opinion of its own investment banker, of no more than the cash being offered in the tender offer. In the face of such an offer, the board may have a duty to seek to protect the company's shareholders from the coercive effects of this inadequate offer. Assume, for purposes of the hypothetical, that neither newly amended Section 203, nor any defensive device available to the target specifically, offers protection. Assume that the target's board turns to the market for corporate

control to attempt to locate a more fairly priced alternative that would be available to all shareholders. And assume that just as the tender offer is closing, the board locates an all cash deal for all shares at a price materially higher than that offered by the acquiring corporation. Would the board of the target corporation be justified in issuing sufficient shares to the second acquiring corporation to dilute the 51% stockholder down so that it no longer had a practical veto over the merger or sale of assets that the target board had arranged for the benefit of all shares? It is not necessary to now hazard an opinion on that abstraction. The case is clearly close enough, however, despite the existence of the *Condec* precedent, to demonstrate, to my mind at least, the utility of a rule that permits, in some extreme circumstances, an incumbent board to act in good faith for the purpose of interfering with the outcome of a contemplated vote. *See also American International Rent-A-Car, Inc. v. Cross, supra,* n. 3.

solicitation by a 9% shareholder. Moreover, here it had time (and understood that it had time) to inform the shareholders of its views on the merits of the proposal subject to stockholder vote. The only justification that can, in such a situation, be offered for the action taken is that the board knows better than do the shareholders what is in the corporation's best interest. While that premise is no doubt true for any number of matters, it is irrelevant (except insofar as the shareholders wish to be guided by the board's recommendation) when the question is who should comprise the board of directors. The theory of our corporation law confers power upon directors as the agents of the shareholders; it does not create Platonic masters. It may be that the Blasius restructuring proposal was or is unrealistic and would lead to injury to the corporation and its shareholders if pursued. Having heard the evidence, I am inclined to think it was not a sound proposal. The board certainly viewed it that way, and that view, held in good faith, entitled the board to take certain steps to evade the risk it perceived. It could, for example, expend corporate funds to inform shareholders and seek to bring them to a similar point of view. *See, e.g. Hall v. Trans–Lux Daylight Picture Screen Corporation,* Del.Ch., 171 A. 226, 227 (1934); *Hibbert v. Hollywood Park, Inc.,* Del. Supr., 457 A.2d 339 (1982). But there is a vast difference between expending corporate funds to inform the electorate and exercising power for the primary purpose of foreclosing effective shareholder action. A majority of the shareholders, who were not dominated in any respect, could view the matter differently than did the board. If they do, or did, they are entitled to employ the mechanisms provided by the corporation law and the Atlas certificate of incorporation to advance that view. They are also entitled, in my opinion, to restrain their agents, the board, from acting for the principal purpose of thwarting that action.

I therefore conclude that, even finding the action taken was taken in good faith, it constituted an unintended violation of the duty of loyalty that the board owed to the shareholders. I note parenthetically that the concept of an unintended breach of the duty of loyalty is unusual but not novel. *See Lerman v. Diagnostic Data, supra; AC Acquisitions Corp. v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103 (1986). That action will, therefore, be set aside by order of this court.

## V.

I turn now to a discussion of the second case which is a Section 225 case designed to determine whether the nominees of Blasius were elected to an expanded Atlas board pursuant to the consent procedure.[6]

On March 6, 1988, after several rounds of mailings by each side, Blasius presented consents to the corporation purporting to adopt its five proposals. The corporation appointed an independent fiduciary (Manufacturers Hanover Trust Company) to act as judge of the stockholder vote. It reported a final tally report on March 17 and issued a Certificate of the Stockholder Vote on March 22. That certificate stated that the vote had been exceedingly close and that, as calculated by Manufacturer's Hanover, none of Blasius' proposals had succeeded. In order to be adopted by a majority of shares entitled to vote, each proposition needed to garner 1,486,293 consents. Each was about 45,000 shares short (about 1.5% of the total outstanding stock).[7]

*Blasius' Position*

Blasius contends that the inspector of elections made an error in the counting of the vote that under our law should be

6. Having decided that the board action of December 31 was invalid in equity, I pass over the dispute whether Messrs. Winter and Devaney could be removed from office by shareholders only for cause.

7. The report of the count was as follows:

| | |
|---|---|
| Proposition 1 (precatory resolution) | 1,444,807 |
| Proposition 2 (amend bylaws to increase board from 7 to 15) | 1,443,464 |
| Proposition 3 (removal of Winters and Devaney) | 1,446,209 |
| Proposition 4 (election of eight new directors) | 1,442,023 |
| Proposition 5 (election of up to seven new directors in event Atlas has more than seven directors validly) | 1,441,234 |

reviewed, and, when reviewed, must be corrected. When corrected, it contends the vote adopted each of its proposals. That "error" is described below. Blasius goes on to argue that while the court may and should review the testimonial (deposition) evidence that establishes this point, it may not rely upon other evidence (offered by Atlas and admitted over objection) that tends to establish that a material number of shares were counted as granting consent by record holders either without authority or in contravention of the beneficial owners' actual intention.

The single "error" that Blasius seeks to have remedied relates to the effect that the judges gave to revocations received from record holders for whom earlier dated consents had been submitted. The background must be set forth. Each side made two mailings to shareholders. Each mailing enclosed a card for voting. The Blasius (white) card provide a space to mark "consent," "consent withheld," or "abstain." [8] It provided that "[s]igned but unmarked consent cards will be deemed to give consent to the action set forth below." [9] The management (blue) card was intended as a revocation card. It also addressed each of the five propositions. While it was intended as a means to revoke consents, one could vote to give a consent by using that card as well. (It is unclear why this revocation card did not simply provide for the revocation of consents already given; perhaps SEC rules require the added confusion that providing for the giving of a consent on a revocation card entails). A "revoke" vote would, of course, have no meaning unless that shareholder had previously granted a "consent." The judges received many revoke cards that did not relate to prior consents—some shareholders used the revoke card as one might use a proxy card to express endorsement of management.

Voting, or the granting of consent to stockholder action, is, of course, the legal right of record holders of stock only. In practice, there are often as many as four (or more) levels of activity in connection with a vote or a consent solicitation. First, record holders are frequently depository companies (Depository Trust Company, for example, holding through its nominee, Cede & Co.). They hold for brokers or other institutions, who in turn hold for beneficial owners. The institutions sometimes contract with Independent Election Company of America (IECA) which distributes voting materials for brokers to their customers and which, as agent, receives back proxy cards or consent cards from beneficial owners, collects them and makes out one or more cards for each broker or bank for which it acts. IECA then physically sends voting cards to the corporation or the judges of election. The depository companies (the actual record holders) will have given blanket proxies to *their* customers—the institutional record holders, who will then act themselves or through IECA.

The judges of the process counted the vote according to the following procedure in calculating the consents. First, the cards of individual stockholders were treated. All of the Blasius (white) cards and the Atlas (blue) cards were put in alphabetical order. They were then matched to see if any consents granted were revoked by later blue cards and the results tallied.

The same general process was followed with the institutional record holders, but it

**8.** Since a consent solicitation requires the affirmative vote of all shares authorized to vote on the question, an "abstain" is the functional equivalent of a "consent withheld" vote.

**9.** This instruction was interpreted by the judges to mean that a signed card on which a shareholder had indicated a position on a single proposition counted as an affirmative vote on each of the other propositions. Literally, a consent card that marks only one of several propositions is not "an unmarked consent." The judges of election clearly erred in counting such cards as consents for unmarked propositions. The cards on their face did not indicate that a consent had been granted in such instances. There were between 400 and 1,000 consents counted as a result of partially completed cards from individuals, many of whom simply marked "withhold" or "abstain" as to one proposition. From institutions, 1,660 consents were counted where only a "withhold" or "abstain" was marked and approximately 15,500 consents were counted where one proposition was consented to, but others were unmarked.

was more complex. First, the cards for each broker or institution were gathered together—both white consents and blue revokes. The consent cards were then inspected to see if there were "clear duplicates." Some institutions—banks typically, but more rarely, brokers—noted their own subaccount number on the consent cards; these numbers were taken to refer to a beneficial owner's account with the institution, and when the same number appeared on a later dated consent, it was taken as a duplicate of an earlier one having the same number. Accordingly, in those instances, the earlier consent was not counted. Brokers, however, do not tend to show subaccount numbers, and with respect to brokerage accounts, there is generally no way for an inspector to know whether a later consent was intended to substitute for an earlier one, unless the earlier one voted all of the shares registered in the name of that broker (or more correctly, all of the shares which Cede & Co. holds for that broker).[10]

The judges matched later revocations with consents. Since most financial institution cards did not have subaccount numbers or otherwise identify the beneficial owner of the shares being voted, there was no way to be sure that a later revocation for, *e.g.*, 2,000 shares was intended to revoke *pro tanto* an earlier consent for, *e.g.*, 5,000 shares, or whether it represented an altogether different 2,000 shares. The judges sought independent legal advice on how they should handle this question. They were advised the following day that they should not seek information beyond that which the cards afforded, and where a record holder revoked consent for some number of shares, that card should be given effect by subtracting from the number of consents submitted by that record holder, the number of shares represented by later dated revocations. This was then done. In some instances, the number of later dated consents exceeded the number of consents submitted by that registered owner.

The judges realized that if the institutions (or IECA who had acted for many of them) had already matched later dated revocations with earlier consents from the same beneficial owner, and had, with respect to any beneficial holder, sent only a consent reflecting a net position, then the process of netting that the judges used would result in disenfranchising some shareholders. The judges adopted the tack of proceeding as if the record holder (or IECA) had not discarded prior consents that had been revoked. They filed a qualified report, however, noting this choice and reporting the results of the vote on the contrary assumption. That report shows that between 56,000 and 59,000 consents (depending upon which of the five propositions are considered) were counted as revoked by reason of this netting process. (About half of those were consents sent by IECA and half directly from institutional record holders). Had no netting been done, the judges would have reported that each of the propositions had been consented to by a very small majority of all shares.

During the course of the count, at the instigation of Blasius, an IECA official telephoned one of the judges of election and explained the process that IECA used in its task as agent for various brokers and banks in sending consent materials, receiving them back, computing totals by beneficial owners, and then creating master consents or revoke cards. That process deletes prior consents from a particular beneficial owner before reporting (or sending in to the judges) net positions. Discovery in this case, and evidence admitted at trial, establishes that this report to the judges of the IECA process was correct. The judges, however, elected, in good faith, to exclude this information from their report (except insofar as they noted the problem and the results on the alternative assumption).

---

10. In one instance, a later dated consent for 12,099 shares noted, "[p]revious proxy will not be counted." The previous consent had been for 2,425 shares. Since the record shareholder owned more than 14,524 shares, the judges counted both as not including a "clear duplicate." This was, in my opinion, clear error. *See* pp. 666, *infra*.

Blasius contends that this course resulted in a clear miscount that now must be corrected.

### Atlas' Position

Atlas responds in two principal ways.[11] First, it says that where the judges act in good faith, neither they nor the court may consider any information except that which appears on the cards. Since the cards in issue do not disclose beneficial ownership, the only course open to the judges, based the upon the information on the cards, was to assume that the later dated revocation cards did revoke consents that were in hand.[12] The demands of a feasible administration of the corporate franchise require that, absent fraud or other wrongdoing, proxy contests or consent contests be judged on the "ballots" and not on extrinsic evidence. On that basis, Atlas asserts the judges' tally must be affirmed.

Atlas' second position is that if one is to inquire beyond the face of the consent cards themselves, then one—in this instance—will see that many, many mistakes were made in this process, a few by the judges and a more significant number by the record holders; if all of those mistakes are to be reviewed and corrected, the result, as declared by the judges, would remain unchanged. A good deal of discovery was conducted, and testimony admitted, concerning this matter. A few examples of the sort of errors to which Atlas here refers are necessary to appreciate its argument. Its discovery program uncovered many instances of what it contends are errors in executing the wishes of the beneficial owners. Its brief focuses on 14 of these. In this opinion, I will limit the discussion to a handful, as I think that is sufficient to understand the nature and scale of the argument.

### A.G. Edwards

A.G. Edwards returned four cards, two each on management's blue revocation form and two on Blasius' white consent form. The two blue cards were dated February 19 and March 4, respectively. The later of the two management cards was also dated March 4. Both of the March 4 cards were stamped "previous proxy will not be counted." In tabulating the total number of consents executed by A.G. Edwards, the judges summed the number of consents given on Blasius' February 19 card, the number of consents given on Blasius' March 4 and the number of consents given on management's February 19 revocation card. The March 4 management card was received too late and was not given effect.

In counting the February 19 Blasius card evidencing consent for 2,425 shares on all propositions in addition to the March 4 Blasius card evidencing consent for 12,099 shares on all propositions and stamped "previous proxy will not be counted," the proxy judges clearly acted contrary to instructions on the face of the card.

### Northern Trust

The February 24 Blasius card evidencing consent for 16,700 shares on all propositions was counted in addition to a later dated (March 4) Blasius card evidencing consent for 18,820 shares. Northern Trust's total position in Atlas stock was 21,159 and the total of these two consents, of course, far exceeded that. The judges did not interpret the March 4 card as superseding the February 24 card, but rather interpreted the two cards as independent (and as an implicit attempt to vote far more shares than the shareholder owned). They counted the two consents as voting the full 21,159 shares. This was not the intention of Northern Trust. It has testified that it

---

**11.** A third argument that, with respect to two of the five proposals, more than 60 days provided in Section 228 elapsed before the consents were delivered, will not need to be addressed.

**12.** The problem apparently arises, in part, from the fact that IECA and other institutional record holders not only gave effect to the revocations from beneficial owners (thus dissipating the ef-

fect of those revocations), but *also* sent a revocation card to the judges reflecting that revocation. This process works in a proxy contest where a later proxy not only revokes an earlier one, but acts as an affirmative vote. It does not, however, make much sense in a consent contest where a revocation has only one effect, and once it is given that effect, is inoperative.

intended its March 4 card to supersede its earlier card and to vote only 18,820 of its shares in favor of the consent.

### State Street Bank

According to Atlas, State Street Bank received oral instructions from Champion Spark Plug, a beneficial holder of 26,890 shares, to vote against the Blasius proposals. State Street then instructed its agent, IECA, to vote the 26,890 shares against the Blasius proposal. Despite these instructions, IECA delivered a card voting 26,890 shares for the proposals and the independent judges recorded the 26,890 shares as voting for the proposals. Blasius contends the record does not show a mistake in this instance.

### E.F. Hutton

E.F. Hutton returned both a Blasius consent and a management revocation card dated March 2. The management revocation card was marked as follows:

(1) –240– FOR –5,873– AGST. –110– ABS.

(2) –200– FOR –6,023– WITHHOLD

(3) –244– FOR –5,873– AGST. –110– ABS.

(4) –244– FOR –5,873– AGST. –110– ABS.

While the evidence discloses that Hutton intended a "for" vote to be in favor of the consent proposal, or a consent, and the much larger "against" vote to be a withholding of consent (but apparently not a revocation of a prior consent), the judges of election counted the votes in the reverse fashion because they appeared on a management revocation card. That is, they interpreted this vote as 240 revocations and 5,873 consents.

### B.C. Christopher

B.C. Christopher Securities Co. is neither a record nor a beneficial stockholder of Atlas. Purporting to act on behalf of some of its customers, it sent to Securities Settlement Corporation, a clearing house with authority to vote Atlas stock by virtue of an omnibus proxy executed by Cede & Co. authority to "vote the 30,000+ shares of Atlas Corp. in favor of ... Blasius." (DX RRR; Spear Dep. at 6–7). At the time this telex was sent, B.C. Christopher did not know how many shares its customers owned; the figure was given to one Gordon Spear, a B.C. Christopher stock broker, by plaintiff, Warren Delano. Securities Settlement rejected this attempt to vote all shares and requested a list of the shareholders consenting. B.C. Christopher then provided Securities Settlement with a list containing the names and positions of all customers serviced in its Denver office whom B.C. Christopher believed owned stock aggregating 23,800 shares.

Securities Settlement, based only upon this list, directed IECA to vote the positions of all those shareholders as consenting to the Blasius proposal. All customers were tabulated by IECA as consenting to their full share amounts. Evidence in this case, however, establishes that a number of the B.C. Christopher customers never gave B.C. Christopher any authority to consent. The shareholdings of B.C. Christopher customers, affirmatively shown not to have authorized consents, totalled some 3,550. Some of these shareholders had indeed sent in revocation cards intending to withhold consent prior to the B.C. Christopher involvement, and the unauthorized advice from the broker, apparently stimulated by plaintiff Delano, was treated as overriding that direct action. Other B.C. Christopher customers were unavailable or refused to give deposition testimony in this case, but documentary evidence indicates that they have denied giving B.C. Christopher authority to exercise power to consent on their behalfs. (*See* DX CCCCC; DX DDDDD) (1,600 shares).

In addition, although some of B.C. Christopher's customers did in fact deliver white consent cards to IECA, IECA did not receive cards indicating consent to Blasius' proposal from some 12 shareholders representing approximately 13,500 shares. B.C. Christopher could produce no written evidence that these or any of the other shareholders in fact authorized it to consent on their behalf.

\* \* \*

Atlas, therefore, in summary, replies to Blasius' position by contending that the judges of election, acting in good faith, handled the ministerial duty of calculating unrevoked consents properly—according to the face of the consent itself, and not on the basis of external matters. It relies upon the Supreme Court case *Williams v. Sterling Oil of Oklahoma, Inc.*, Del.Supr., 273 A.2d 264 (1971) in that connection.

Beyond that, it contends that if the court is to go beyond the face of the consents to consider extraneous matters, that the record developed shows that the Blasius proposal did not garner the support of a majority of the beneficial owners, even if the court were to deem it appropriate to reverse the "netting" procedure followed by the judges. It contends that one need not get to that level of review, however, because a ministerial review of the consents delivered is sufficient and, under that approach, it would prevail.

Finally, I should note Blasius' rebuttal, which is as follows: It contends that the face of the consents is what governs, but that the judges neglected to engage in a presumption that exists as a matter of law. The limited evidence of record holders that it submits simply confirms that presumption to in fact be true here. Once that legal presumption is correctly understood, and the "netting" is reversed due to its application, Blasius says that its proposals have been adopted. The presumption arises from the case of *Schott v. Climax Molybdenum Company*, Del. Ch., 154 A.2d 221 (1959). Blasius says that the other evidence of "errors" is irrelevant.

I turn to my analysis of these positions now.

## VI.

◼ The multilevel system of beneficial ownership of stock and the interposition of other institutional players between investors and corporations (*e.g.*, IECA or brokers whose customers hold stock beneficially) renders the process of corporate voting complex. This case demonstrates that the currently employed process by which consents are solicited and counted is even more prone to problems than is the process of proxy counting. In reviewing the computating of the outcome of a proxy fight or a consent contest, the law does not inquire into the subjective intent of either the record owner or the beneficial owner in the usual case.[13]

◼ A legal test that made inquiry into the subjective wishes of ultimate owners relevant would, of course, threaten to convert every close proxy fight into protracted and costly litigation. The law has avoided that risk while attempting to preserve a credible claim to corporate democracy by announcing the rule that only record owners are entitled to vote and if any investor chooses to hold his stock in some fashion other than his own name, he thereby assumes the risk that involving intermediaries will entail. *See, e.g., The American Hardware Corporation v. Savage Arms Corporation*, Del.Supr., 136 A.2d 690 (1957); *ENSTAR Corp. v. Senouf*, Del. Supr., 535 A.2d 1351 (1987). Moreover, even as to record owners, the administrative need for expedition and certainty are such that judges of election (and reviewing courts absent fraud or breach of duty) are not to inquire into their intention except as expressed on the face of the proxy, consent or other "ballot." The Supreme Court has held:

> We hold the proper rule to be that, in the exercise of their ministerial functions and powers, the inspectors of an election must reject all identical but conflicting proxies when the conflict cannot be resolved from the face of the proxies themselves or from the regular books and records of the corporation. Otherwise stated, conflicting proxies, irreconcilable on their faces or from the books and records of the corporation, may not be reconciled by extrinsic evidence. *See Pope v. Whitridge*, 110 Md. 468, 73 A. 281, 286 (1909); 5 Fletcher, Cyclopedia of

---

**13.** A different approach, at least by the court, might well be appropriate where fraud or the breach of fiduciary duty is alleged. *See, e.g., In re Canal Construction Co.*, Del.Ch., 182 A. 545 (1936).

Corporations, § 2062 (Perm.Ed.1967); 2 Thompson on Corporations, § 1021 (3rd Ed.1927); Rogers, Proxy Guide for Meetings of Stockholders, §§ 19, 39 (1969). This rule is dictated by the necessity for practical and certain procedures in the fair handling of proxies and the expeditious conclusion of corporate elections.

\* \* \* \* \* \*

The policy favoring correction of mistake must be limited to corrections that can be made from the face of the proxy itself or from the regular books and records of the corporation. The acceptance and consideration of extrinsic evidence for the purpose, especially when questioned and controverted as here, improperly take the inspectors over the line from the realm of the ministerial to that of the quasi-judicial.

*Williams v. Sterling Oil of Oklahoma, Inc.,* 273 A.2d at 265–66.

Both sides to this contest invoke the authority of *Williams.* Defendant does so straightforwardly, plaintiff with the addition of another precedent, *Schott v. Climax Molybdenum Company,* Del.Ch., 154 A.2d 221 (1959). *Schott* is said by plaintiff to establish a legal rule (which the judges of election here are said to have violated) that later proxies (and, by extension, consents) from brokers are presumed to be with respect to stock held for different beneficial owners than earlier proxies from the same broker, unless otherwise noted on the face of the proxy. In *Schott,* the court was asked to review the vote that authorized a merger. The judges had counted several proxies received sequentially from a broker (actually there were a number of brokers in the same position). Together those proxies covered *less* than the total number of shares registered in the name of the broker. On their face, the proxies did not revoke prior proxies. The judges counted all such proxies.

On review, plaintiffs contended that this was error. Their theory was that a later proxy revokes an earlier one. The court held:

> Clearly a later proxy revokes an earlier one when such instructions appear on the face of the later proxy. And there is no question but that a later proxy revokes an earlier one where the total number of shares registered in the name of the person giving the proxies is included in each proxy. But is the rule that a later proxy revokes an earlier one applied indiscriminately?
>
> As noted, the various proxies in each series were not, in toto, in excess of the total registered in the particular stockholder's name. Nor were any instructions contained on the proxies. Thus, *there is nothing on the face of the proxies which rendered the counting of all of such shares inconsistent. Although not the case here, such a later proxy might be intended to revoke an earlier one. Since it is not necessarily so, I believe the inspectors of election properly resolved the doubt in favor of counting both.* My conclusion is based in part on a general policy against disenfranchisement. See *Gow v. Consolidated Coppermines Corp.* [19 Del.Ch. 172, 165 A. 136] above; *Investment Associates v. Standard Power & Light Corp.,* 29 Del.Ch. 225, 48 A.2d 501, *affirmed* 29 Del.Ch. 593, 51 A.2d 572. It is also based upon the fact, as here, that this problem arises largely from broker given proxies. Such brokers are undoubtedly expressing the varying wishes of beneficial owners.
>
> Obviously, brokers should, as the Stock Exchange Rule provides, make their intention clear on the face of the proxy. Nevertheless, I think my conclusion is more likely to implement the true intent of the beneficial owner. I conclude that the particular proxies here involved were properly counted by the inspectors. Nor is there any basis in the evidence for rejecting such votes. The evidence adduced shows that in fact the shares, with one exception, were voted in accordance with the wishes of the beneficial owners.

*Schott v. Climax Molybdenum Company, supra* at 223. (emphasis added).

■ I do not read *Schott* as establishing a rule that, in a consent solicitation, a later

dated revocation from a broker-registered owner is to be assumed to be with respect to a different beneficial owner than an earlier dated consent unless the reverse appears from the face of the card. Such a rule would require judges to assume that the submission of revocation cards (at least those that contained no consents as well) was a futile act since the "assumption" would leave such revocations in each instance revoking nothing. The proxy setting with which *Schott* dealt is different than the consent setting in a significant respect. There, to hold that a later dated proxy by a broker-registered owner was not intended to revoke an earlier one (on the assumption that it is with respect to a different beneficial owner) is to give effect to both submissions. It accords to each submission the effect that it calls for on its face. The later *Williams* opinion of the Supreme Court affirms that, absent fraud, or breach of duty, effect must be given to properly submitted proxies that are not inconsistent. Plaintiffs' interpretation of *Schott* would accord no effect to a properly submitted revocation, and is not required by *Schott* itself. It must, therefore, be rejected; it is, in my opinion, inconsistent with *Williams.*

There were mistakes made by the judges (*see, e.g.,* footnotes 9 and 10 above) and by record owners and their agents; there appears to have been unauthorized and perhaps even wrongful behavior (*e.g.,* B.C. Christopher & Co.). Much of the problem arises from the perhaps thoughtless utilization of proxy contest procedures for a consent solicitation contest. But the mistakes of the judges, on balance, tend to cut against plaintiff. The "netting" procedure did not, in my opinion, constitute a mistake of theirs. Rather, it resulted from the actions of record holders or their IECA agent. As such, I see it as not different in principle from other execution errors of record holders (*e.g.,* E.F. Hutton, and possibly, State Street Bank).

We cannot know, in these circumstances, what the outcome of this close contest would have been if the true wishes of all beneficial owners had been accurately measured. The parties must, in my opinion, be content with the result announced by the judges. Those mistakes that were made by the judges do not alter the outcome.

Judgment will be entered in favor of defendants. An appropriate form of order may be submitted on notice.