# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL A. ROSENBAUM, JEFFREY P. BEATY, and ARTHUR L. WILMES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **C.A. No. 2021-0728-JRS** |
| CYTODYN INC., SCOTT A. KELLY, NADER Z. POURHASSAN, JORDAN G. NAYDENOV, ALAN P. TIMMINS, SAMIR R. PATEL, and GORDON A. GARDINER, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  October 8, 2021
Date Decided:  October 13, 2021

Lisa Zwally Brown, Esquire of Greenberg Traurig, LLP, Wilmington, Delaware; Hal S. Shaftel, Esquire and Sarah E. Atlas, Esquire of Greenberg Traurig, LLP, New York, New York; and Brendan Quigley, Esquire and Brian Kerr, Esquire of Baker Botts LLP, New York, New York, Attorneys for Plaintiffs.

Kevin R. Shannon, Esquire, Jonathan A. Choa, Esquire, Christopher N. Kelly, Esquire and Daniel M. Rusk, IV, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Andrew W. Stern, Esquire, Isaac S. Greaney, Esquire, Alex J. Kaplan, Esquire and Charlotte K. Newell, Esquire of Sidley Austin LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

On October 28, 2021, the stockholders of Defendant, CytoDyn Inc. ("CytoDyn" or the "Company"), will hold their annual meeting (the "Annual Meeting"). At that meeting, among other things, the stockholders will elect the latest iteration of CytoDyn's board of directors (the "Board"). CytoDyn's bylaws require stockholders to provide advance notice of matters they wish to place on the agenda for the Annual Meeting, including their intent to nominate candidates for election to the Board.

The plaintiffs in this action lead a group of dissident CytoDyn stockholders who have proposed a slate of candidates for election to the Board. They allege they provided advance notice of their nominations in compliance with CytoDyn's bylaws (the "Nomination Notice"). CytoDyn's incumbent Board disagrees and has rejected the Nomination Notice. Having done so, they now refuse to place Plaintiffs' proposed slate of nominees on the ballot. In response, Plaintiffs initiated this action against the incumbent Board and the Company to secure a declaration that the Company has wrongfully rejected the Nomination Notice and a mandatory injunction compelling the Company to allow Plaintiffs' nominees to stand for election.

1

The Court granted Plaintiffs' application to expedite the litigation; the parties have engaged in expedited discovery; and the matter has been submitted for decision following a trial on a "paper record." As explained below, my verdict is for Defendants.

In a twist that suggests the law in this area may not be as settled as one would think, particularly given the density of our jurisprudence in the "advance notice bylaw" space, the parties have offered two very different perspectives of the standard of review by which I should review the evidence and ultimately adjudicate the dispute. Plaintiffs maintain the evidence presents a classic scenario that triggers "*Blasius* review," invoking Chancellor Allen's seminal decision to argue that the Court should subject Defendants' conduct to enhanced scrutiny since the incumbent Board has "act[ed] for the primary purpose of preventing the effectiveness of a shareholder vote."[1] In doing so, Plaintiffs say, the Court should require Defendants to prove a "compelling justification for [their] action[s]."[2]

Defendants, on the other hand, argue this case implicates nothing more than a straightforward "contractual analysis," arguing that since the bylaws represent a contract between the Company and its stockholders, and the evidence clearly reveals

---

[1] *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 660 (Del. Ch. 1988).

[2] *Id.* at 661.

that Plaintiffs did not comply with the advance notice bylaw, Plaintiffs cannot achieve the remedy they seek because they have not performed the contract they seek to enforce. In this regard, they invoke our Supreme Court's recent decision in *BlackRock Credit Allocation Income Trust v. Saba Capital Master Fund, Ltd.*, where the Court made clear that "advance notice bylaws are commonplace and are interpreted using contractual principles."[3] The Court went on to explain that Delaware law will protect shareholders "in instances where there is manipulative conduct or where the electoral machinery is applied inequitably," but it ultimately declined to apply heightened scrutiny upon concluding the evidence did not support a finding that the incumbent board had engaged in "manipulative conduct."[4]

Having carefully considered the parties' arguments, I am satisfied that enhanced scrutiny under *Blasius* is not justified here. As explained below, CytoDyn's advance notice bylaw had been in place for years before Plaintiffs submitted their Nomination Notice. No one disputes that the bylaw was adopted on the proverbial "clear day." And Plaintiffs were well aware of, and understood, the advance notice bylaw; indeed, the evidence reveals they parsed it carefully before submitting their Nomination Notice.

---

[3] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 980 (Del. 2020) (internal quotation marks omitted).

[4] *Id.* at 981.

Where Plaintiffs ultimately went wrong here is by playing fast and loose in their responses to key inquiries embedded in the advance notice bylaw, and then submitting their Nomination Notice on the eve of the deadline, leaving no time to fix the deficient disclosures when the incumbent Board exposed the problem. While the incumbent Board was not as responsive as it perhaps should have been, and was operating under the structural conflicts that confront any incumbent board charged with enforcing an advance notice bylaw in the face of a notice that stockholders intend to propose a dissident slate for election to the board, the evidence presented at trial does not support a finding that this incumbent Board engaged in manipulative conduct in its dealings with Plaintiffs.

Applying the unambiguous terms of the advance notice bylaw, it is clear Plaintiffs' Nomination Notice fell short of what was required. In particular, Plaintiffs were obliged to disclose who was "supporting" their efforts and information regarding potential conflicts. Rather than offer specific information, or even general information, regarding their supporters, Plaintiffs chose to disclose nothing. They also failed to provide information regarding an obvious conflict involving a nominator and a nominee. These omissions, in turn, left their Nomination Notice fatally incomplete. And, since it was incomplete when submitted on the eve of the deadline, the Nomination Notice did not provide "Timely Notice" as defined and required by the advance notice bylaw. After so concluding,

4

the incumbent Board was justified in rejecting the Nomination Notice. Under these circumstances, neither the bylaws nor equity justify the extraordinary remedy Plaintiffs seek here. Their request for declaratory and mandatory injunctive relief, therefore, must be denied.

## I. BACKGROUND

The following facts were proven by a preponderance of the trial evidence.[5]

### A. The Parties

Plaintiffs, Paul A. Rosenbaum, Jeffrey P. Beaty and Arthur L. Wilmes, are individual stockholders of CytoDyn who, as of June 30, 2021, the date on which Plaintiffs submitted their Nomination Notice to CytoDyn, collectively owned 2,278,888 shares of CytoDyn common stock.[6]

The individual defendants are all members of the incumbent Board.[7] In addition to serving as directors, Defendants, Scott A. Kelly and Nader Z.

---

[5] Joint trial exhibits are cited as "JX #." Depositions taken for trial and submitted to the Court are cited as "[Witness Name] Dep. [Page:Line]." For ease of reference, individuals are identified by their surnames without regard to formal titles, such as "Dr." No disrespect is intended.

[6] Pls.' Verified Compl. for Declaratory Relief (D.I. 1) ("Compl.") ¶ 6.

[7] Compl. ¶ 9.

Pourhassan, are both officers of CytoDyn, holding the positions of Chief Medical Officer and Chief Executive Officer, respectively.[8]

Defendant, CytoDyn, is a pharmaceutical firm with its principal place of business in Vancouver, Washington.[9] CytoDyn is in the process of developing and commercializing a new drug, Leronlimab, a monoclonal antibody intended as a treatment for COVID-19, HIV and cancer.[10] The drug is still in development and has yet to receive regulatory approval.[11]

## B. The CytoDyn Bylaws

CytoDyn was initially formed as a Colorado corporation but was reincorporated in Delaware in 2015.[12] The reincorporation was effected by the merger of the Colorado entity with and into a newly formed, wholly owned Delaware subsidiary, leaving CytoDyn as the surviving entity.[13] As part of the reincorporation process, the Company adopted a new certificate of incorporation and new bylaws,

---

[8] *Id.*

[9] Compl. ¶¶ 2, 8.

[10] Compl. ¶¶ 2, 8, 15.

[11] Compl. ¶¶ 8, 15; Defs.' Answer and Defenses to Verified Compl. ¶ 8; Defs.' Opening Pre-Trial Br. ("DOB") (D.I. 42) at 3; JX093.0001; JX266.0002.

[12] JX004.0002.

[13] *Id.*

6

which, along with the reincorporation and terms of the merger, were approved by CytoDyn's stockholders at the Company's 2015 Annual Meeting.[14]

As described in the Form 8-K filed by CytoDyn on November 19, 2018, CytoDyn engaged in a holding company reorganization under Section 251(g) of the Delaware General Corporation Law ("DGCL") in 2018.[15] To effect the reorganization, the Company needed to adopt amended and restated bylaws.[16] Accordingly, CytoDyn adopted the Amended and Restated By-Laws of CytoDyn Inc. on November 16, 2018 (the "Bylaws"). As required under Section 251(g) of the DGCL, the substance of the Bylaws was identical to the bylaws

---

[14] *Id.*

[15] CytoDyn Inc., Current Report (Form 8-K), at 2, 7 (Nov. 19, 2018). While neither party disputes that the Bylaws were properly adopted years before the Nomination Notice was submitted, neither party cited to evidence that supported this assumption. In their opening brief, Defendants cite to JX004 (Form 8-K for CytoDyn filed on September 1, 2015) to support the fact that CytoDyn adopted new governing documents in connection with its reincorporation from Colorado to Delaware. Yet, to support the statement that CytoDyn properly adopted the amended and restated bylaws on November 16, 2018, Defendants cite only to JX239, which is a copy of the actual bylaws. Accordingly, I turned to the Form 8-K filed by CytoDyn on November 19, 2018, to confirm that the current bylaws were properly adopted, even though the filing was not submitted as an exhibit. CytoDyn was required by law to file the Form 8-K disclosing the adoption of the Bylaws, and so it is properly subject to judicial notice for the limited purpose of confirming that the current bylaws were adopted as disclosed. *See, e.g.*, *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007) (holding that the court may take judicial notice of public documents such as SEC filings that are required by law to be filed); *accord Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (same).

[16] CytoDyn Inc., Current Report (Form 8-K), at 7 (Nov. 19, 2018).

adopted by CytoDyn's stockholders in 2015.[17]  The Bylaws remain in force today

and include the advance notice bylaw at issue here.[18]

The advance notice bylaw, Article I, Section 2 of the Bylaws, is entitled

"Notice of Stockholder Business and Nominations" (the "Advance Notice

Bylaw").[19]  It provides, in relevant part, that "[n]ominations of persons for election

to the Board of Directors and the proposal of other business to be considered by the

stockholders may be brought before an Annual Meeting only": (i) pursuant to

CytoDyn's notice of a meeting, (ii) by or at the direction of the Board or (iii) by a

qualifying stockholder.[20]  It then clarifies that, for nominations by stockholders, such

nominations may be made "by any stockholder of [CytoDyn] who was a stockholder

of record at the time of giving of notice provided for in this [Bylaw], who is entitled

to vote at the meeting, and who complies with the notice procedures set forth in this

[Bylaw] as to such nomination or business."[21]

---

[17] *Id.*

[18] DOB at 6.

[19] JX017.0001 (Bylaws Art. I § 2).

[20] JX017.0001 (Bylaws Art. I § 2(a)(1)).

[21] *Id.*  The parties do not dispute that Plaintiffs were stockholders of record at the time the Nomination Notice was submitted and that Plaintiffs are entitled to vote at the upcoming annual stockholder meeting.  As previewed, this dispute centers around whether Plaintiffs complied with the requisite notice procedures.

Section 2(a)(2) of the Advance Notice Bylaw provides that for a stockholder's

nomination to be deemed proper,

> the stockholder must (i) have given Timely Notice (as defined below) thereof in writing to the Secretary of the Corporation, (ii) have provided any updates or supplements to such notice at the times and in the forms required by this [Bylaw], and (iii) together with the beneficial owner(s), if any, on whose behalf the nomination or business proposal is made, have acted in accordance with the representations set forth in the Solicitation Statement (as defined below) required by this [Bylaw].[22]

Additionally, the Advance Notice Bylaw details categories of information that

"[s]uch stockholder's Timely Notice shall set forth."[23]   According to Defendants,

four such categories are relevant here:[24]

*First*, the Advance Notice Bylaw incorporates the disclosure requirements in

Regulation 14A of the Securities Exchange Act of 1934:[25]

> (A) as to each person whom the stockholder proposes to nominate for election or reelection as a director, all information relating to such person that is required to be disclosed in solicitations of proxies for

---

[22] *See* JX017.0001 (Bylaws Art. I § 2(a)(2)).   To be considered a "Timely Notice," a stockholder's compliant written notice must be received by CytoDyn's secretary at CytoDyn's principal executive offices no later than close of business on the 90th day nor earlier than the close of business on the 120th day prior to the one-year anniversary of the preceding year's Annual Meeting.  While the Bylaws do provide for alternative methods of calculating the notice deadline if no Annual Meeting was held in the preceding year, there is no dispute that, this year, any stockholder notice of nomination was due, at the latest, on July 2, 2021.

[23] *Id.*

[24] DOB at 7–11.

[25] Regulation 14A sets forth the rules relating to the solicitation of proxies, including Rules 14A-1 to 14B-2.

election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Exchange Act (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected) provided, further, that the Corporation may require any proposed nominee to furnish such other information as the Corporation may reasonably require to determine the eligibility of such proposed nominee to serve as a director of the Corporation.[26]

That same information is required with respect to the "Proposing Persons" and their solicitation:[27]

> (C) (i) the name and address of the stockholder giving the notice, as they appear on the Corporation's books, and the names and addresses of the other Proposing Persons (if any) and . . . (iv) any other information relating to such stockholder and beneficial owner, if any, required to be disclosed in a proxy statement or other filings required to be made in connection with the solicitation of proxies for, as applicable, the proposal and/or for the election of directors in an election contest pursuant to and in accordance with Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder;[28]

> *Second*, in Subsection D, the Advance Notice Bylaw requires disclosure of additional information regarding the Proposing Persons:

> (D) (i) *a description of all agreements, arrangements or understandings by and among any of the Proposing Persons, or by and among any Proposing Persons and any other person* (including with

---

[26] JX239.0001.

[27] "Proposing Persons" is defined in the Advance Notice Bylaw as "the following persons: (i) the stockholder of record providing the notice of nominations or business proposed to be brought before a stockholders' meeting, and (ii) the beneficial owner(s), if different, on whose behalf the nominations or business proposed to be brought before a stockholders' meeting is made." JX017.0001.

[28] JX239.0001–0002.

any proposed nominee(s), including any agreements, arrangements or understandings relating to any compensation or payments to be paid to any such proposed nominee(s)), pertaining to the nomination(s) or other business proposed to be brought before the meeting of stockholders (which description shall identify the name of each other person who is party to such an agreement, arrangement or understanding) . . . .[29]

*Third*, Subsection D then requires that a Timely Notice disclose the:

(ii) identification of the names and addresses of other stockholders (including beneficial owners) known by any of the Proposing Persons to support such nominations or other business proposal(s), and to the extent known the class and number of all shares of the Corporation's capital stock owned beneficially or of record by such other stockholder(s) or other beneficial owner(s);[30]

*Fourth*, "[i]n addition to the requirements set forth elsewhere," the Advance Notice Bylaw requires that "to be eligible to be a nominee," one "must deliver, in accordance with the time periods for delivery of Timely Notice . . . a completed and signed questionnaire with respect to the background and qualification of such proposed nominee and the background of any other person or entity on whose behalf the nomination is being made. . . ."[31]

---

[29] JX239.0002 (emphasis added).

[30] JX239.0002.

[31] JX239.0004; *accord* JX061.0004 (memo from Rosenbaum outlining certain requirements of the Advance Notice Bylaw).

The Advance Notice Bylaw explicitly provides that except as provided by the Exchange Act, "only such persons who are nominated in accordance with the provisions of this By-law shall be eligible for election . . . ."[32] The consequences for non-compliance are stated clearly:

> The Board of Directors or a designated committee thereof shall have the power to determine whether a nomination or any business proposed to be brought before the meeting was made in accordance with the provisions of this By-law. . . . If the Board of Directors or a designated committee thereof or the presiding officer, as applicable, determines that any stockholder proposal or nomination was not made in accordance with the provisions of this By-law, such proposal or nomination shall be disregarded and shall not be presented for action at the meeting.[33]

## C. Plaintiffs' Proposed Slate

Plaintiffs' proposed director slate consists of Plaintiff, Rosenbaum, and non-party nominees, Thomas Errico, Bruce Patterson, Melissa Yeager and Peter Staats (collectively, "Plaintiffs' Nominees").[34] Patterson and Beaty have ties to another company, IncellDx, Inc. ("IncellDx"), which itself was a CytoDyn stockholder as of the date of the Nomination Notice.[35] According to Defendants, Plaintiffs

---

[32] JX239.0003.

[33] *Id.*

[34] Compl. ¶ 7.

[35] JX178.0037 (Schedule 13D submitted on behalf of Plaintiffs and other dissident stockholders: "The shares listed as being beneficially owned by Dr. Patterson are directly owned by IncellDx, of which Dr. Patterson is the Chief Executive Officer."). Patterson is the founder, Chief Executive Officer and director of IncellDx, which is a private

12

intentionally failed to disclose certain information in their Nomination Notice to hide the central role that IncellDx and its owners—among them, Plaintiff Beaty and Nominee Patterson—are playing in support of Plaintiffs' Nominees.[36]

### D. CytoDyn's History with IncellDx

The complicated relationship between CytoDyn and IncellDx, which certainly colors the parties' adversarial positions in this action, extends beyond having potentially overlapping owners and directors. Between October 2018 and May 2020, Patterson served as a consultant for CytoDyn, providing assistance with certain assay tests relating to HIV and COVID-19.[37] This relationship was governed by a consulting agreement dated October 10, 2018 (the "Consulting Agreement").[38]

More relevant here, on May 22, 2020, Patterson emailed a presentation to Defendants Pourhassan and Kelly outlining a proposal whereby CytoDyn would acquire IncellDx for as much as $350 million.[39] The proposal contemplated that

---

diagnostics company incorporated in Delaware. JX175.0140; Beaty Dep. 24:4, 145:11; JX265. Patterson and his wife collectively own approximately 33.04% of IncellDx. JX175.0144. Beaty, like Patterson, is an IncellDx director and stockholder. Beaty Dep. 24:18–25:1. Beaty is the owner of roughly 2.3% of IncellDx's common stock. Beaty Dep. 26:17–19.

[36] DOB at 2. As discussed below, Defendants maintain that IncellDx is not aligned with the long-term interests of CytoDyn and its stockholders.

[37] JX014.

[38] JX014; JX023.0001.

[39] JX025.0003–0017; Beaty Dep. 73:23–74:3. According to the proposal, notwithstanding IncellDx's relatively steep asking price, IncellDx's annual revenue in 2019 was only

CytoDyn would employ Patterson if the transaction was consummated.[40] Once received, Kelly promptly forwarded the proposal for action by the entire Board.[41] That same day, Patterson resigned from his consultant position and expressed excitement regarding his future employment with CytoDyn.[42] After consideration by the Board, CytoDyn did not accept the proposal.[43]

Less than two months after resigning as a consultant for CytoDyn, Patterson filed an application with the United States Patent and Trademark Office on behalf of IncellDx to patent methods for treating certain infections using means similar to CytoDyn's drug, Leronlimab.[44] CytoDyn subsequently (and successfully) challenged the move by filing a third-party submission to the United States Patent Office to block IncellDx's patent application.[45] According to Defendants, this patent

---

$4 million. JX025.0010; JX207.0010. I note that the parties dispute who, as among CytoDyn and IncellDx, made the first overture. Because I am satisfied the answer to that question ultimately does not matter, I decline to resolve that dispute here.

[40] JX025.0013.

[41] JX025.0001.

[42] JX024.0002.

[43] Beaty Dep. 83:17–20.

[44] JX028.0001; JX250.

[45] JX250.

dispute was fresh in the minds of Plaintiffs when they submitted their Nomination Notice.[46]

### E. Plaintiffs Prepare for a Proxy Contest

Plaintiffs began considering a proxy campaign as early as March 2021. On March 22, 2021, Rosenbaum, a former practicing attorney, sent a memo to certain CytoDyn stockholders, which summarized the Bylaws pertaining to director candidate nominations and provided advice on how to comply with the requirements.[47] Rosenbaum wrote:

> It is crucial to strictly follow all of these procedures because if it is determined by the Board "or a designated committee thereof or the presiding officer," that "any stockholder proposal or nomination was not made in accordance with the provisions of this By-law, such proposal or nomination shall be disregarded and shall not be presented for action at the meeting."[48]

Five days later, on March 27, 2021, apparently as a reminder, Rosenbaum forwarded an email to himself, dated November 28, 2020, that was originally sent to CytoDyn's Board "on behalf of CytoDyn shareholders representing over

---

[46] DOB 12, 18.

[47] DOB at 13; JX050.0002–0005; JX061.0001–0004; JX074.0001.

[48] JX050.0003 (citing the Bylaws); JX061.0001 (same).

175,000,000 shares of common stock and growing."[49]  In this email, among other initiatives, the stockholders advocated for the "reestablish[ment] [of] a robust cooperative, collaborative, and harmonious scientific and business relationship" between CytoDyn, Patterson and IncellDx.[50]  The email reported that the interested CytoDyn stockholders "believe that negotiations between the parties would be mutually beneficial and critical to the success of CytoDyn."[51]

A few weeks later, on April 16, 2021, Wilmes sent Rosenbaum an excerpt of the Bylaws, including the Advance Notice Bylaw, and asked, "Has the date for the Annual Meeting been set? You are aware of the 90[-day] prior deadline for filing nominations."[52]  Rosenbaum replied, "Not yet!!! Have my eye on it."[53]

1. **Patterson's and IncellDx's Role**

By the start of the following month, preparations for the Plaintiffs' proxy contest were well underway, including the hiring of lawyers, a proxy solicitation

---

[49] JX052.0001. *See* Beaty Dep. 116:22–23.  The stockholder who originally sent this email ultimately provided financial support for the Rosenbaum-led proxy contest.  He is also an IncellDx shareholder. *See* Patterson Dep. 194:24–195:5.

[50] *Id.*

[51] JX052.0002.

[52] JX058.0001.

[53] *Id.*

firm and a public relations firm to support Plaintiffs' efforts.[54]  Following a May 6,

2021 meeting of dissident stockholders, including Dr. Patterson and "35 very large

stockholders of [CytoDyn]," a non-party CytoDyn stockholder wrote in an email that

the stockholder group believed "the lack of management experience" was hurting

CytoDyn's effort to obtain FDA approval for Leronlimab.[55]  The email stated that

the group planned to replace certain executive members of the Board by means of a

proxy vote at the upcoming Annual Meeting.[56]  According to the email, Patterson

and ex-CEO of eBay, Devon Williams, would be nominated and, once in place,

"Patterson [] said he would consider merging IncellDx with [CytoDyn] to help give

[CytoDyn] immediate creditably [sic] and the resources to get the drug approved."[57]

---

[54] JX251; JX252; Rosenbaum Dep. 47:11–14.

[55] JX076.0001.  I note that Plaintiffs went to great lengths in their briefs to justify the *bona fides* of their proxy contest.  For instance, they remind the Court that just last year Vice Chancellor Fioravanti "rebuked Pourhassan, Kelly and other Board members" for demonstrating "unmitigated greed" in granting themselves "improper stock grants." Pls.' Opening Br. in Advance of Final Hr'g on the Merits ("POB") (D.I. 41) at 3.  They also question a governance structure where Pourhassan, as Board member, is meant to answer to the Chairman of the Board, Kelly, while Kelly, as Chief Medical Officer, is meant to answer to Pourhassan as Chief Executive Officer.  POB at 9 (citing Kelly Dep. 9:2–17; Pourhassan Dep. 19:23–20:10).  While these are troubling facts, they are, as explained below, ultimately irrelevant to the issues presented here.  CytoDyn has an Advance Notice Bylaw.  Plaintiffs failed to comply with that bylaw in the submission of their Nomination Notice.  And the deficiencies were significant.  Accordingly, the incumbent Board properly rejected the defective notice.

[56] JX076.0001.

[57] *Id.*

17

The email went on to solicit donations to pay for legal fees and advertising to support the effort, with funds to be held by "CCTV."[58] CCTV was likely a reference to CCTV Proxy Group, LLC (short for "CytoDyn Committee To Victory"), a limited liability company formed by Rosenbaum to fund the proxy contest.[59] Rosenbaum maintained handwritten notes of the names of the donors to CCTV, their incremental donation amounts and the total donation tallies as of various dates.[60]

Throughout May 2021, Rosenbaum sent multiple emails to CytoDyn stockholders regarding the pending proxy contest.[61] In a May 8 email to dissident stockholders, Rosenbaum announced that "Dr[.] Bruce Patterson will head up the proposed new BD for CytoDyn if were [sic] successful."[62] Four days later, Rosenbaum sent another email announcing that the dissident stockholders had met their minimum goal of getting "5% of the outstanding shares of the company," but still needed financial contributions to pay (1) a law firm for filing requirements and legal issues, (2) a proxy firm to help win an election, and (3) a social media firm.[63]

---

[58] *Id.*

[59] JX095.0001–0002; *see also* Rosenbaum Dep. 44:16–22.

[60] JX243.

[61] JX080; JX087.

[62] JX270.0002.

[63] JX087.0001 (emphasis omitted).

18

In the same email, Rosenbaum assured the stockholders that he and three other "activist investors" would form an LLC "and take most of the responsibilities."[64] Based on the evidence, it is reasonable to infer that this LLC was, in fact, CCTV.

### 2. Defendants' Reactions to Plaintiffs' Organizing Efforts

While Plaintiffs were busy coordinating their proxy contest, the Board was busy taking actions that Plaintiffs allege were meant deliberately to undermine Plaintiffs' efforts.[65] The Board's first move came on May 19, 2021, when Kelly wrote to the other CytoDyn directors to share his view that the actions of the dissident group justified "considering Gordon Gardiner at your earliest convenience [to be seated as an additional] independent director."[66] In response, Patel asked for more information on the proxy campaign and on Gardiner, to which Kelly rejoined, "[w]e believe having another independent director at this time would be of value to the company and for our shareholders."[67] On June 30, 2021, Gardiner's appointment to the Board was approved, effective the following day.[68]

---

[64] *Id.*

[65] POB at 25.

[66] JX096.0002.

[67] JX096.0001.

[68] JX184.0002. Plaintiffs do not directly challenge Gardiner's appointment and seek no relief in that regard.

In an attempt to stay abreast of Plaintiffs' burgeoning proxy contest, Defendants employed stockholder Chris Lonsford as a consultant.[69] Lonsford surreptitiously accessed emails among dissident stockholders and forwarded them to Pourhassan, attempted to sow discord among the dissident group, wrote weekly summaries about CCTV, and monitored Patterson's role in the proxy campaign and the general sentiments of the stockholders (both pro-management and dissident).[70] On May 14, 2021, Lonsford updated CytoDyn's Corporate Secretary, Arian Colachis, that "Bruce Patterson's agenda is to get [IncellDx] aquired [sic] and nothing more."[71]

Rosenbaum was suspicious of Lonsford's role as a potential 'spy' and dispatched his son, Russ Rosenbaum, covertly to monitor attendance at dissident stockholder meetings.[72] In an email to his father, Rosenbaum's son wrote: "Of course I'll be watching out for Chris Lonsford. Be really interesting to see if he donates."[73]

---

[69] JX182.0001.

[70] JX079.0001–0004; JX139; JX167; JX182; JX197; JX 267.

[71] JX089.0002.

[72] JX081.0001–0002. Rosenbaum wrote to his son "[w]hat name did you use?" The response: "Sam Brown." JX081.0001.

[73] JX081.0001.

## F. Plaintiffs File Their Schedule 13D and Nomination Notice

On May 24, 2021, Plaintiffs filed a Schedule 13D with the Securities Exchange Commission ("SEC").[74] They sent their Nomination Notice to CytoDyn more than a month later, on June 30, 2021.[75] The Nomination Notice was received by the Company the next day, one day before the deadline set by the Advance Notice Bylaw.[76]

The 222-page Nomination Notice provided information about the Plaintiffs, their nominees and answers to the questionnaires that were incorporated within the Advance Notice Bylaw.[77] Relevant here, one of the questions to which Patterson responded reads as follows:

> B1. Since June 1, 2019, have you . . . engaged in any "transaction," or has any "transaction" which currently is under consideration been proposed, in which [CytoDyn] or any of its "subsidiaries" was or is to be a participant and the amount involved exceeds $120,000 and in which you . . . will have a direct or indirect "material" interest? . . . In response to this question, you should include any indirect interest arising from a position or relationship you have with an entity engaged in the transaction with the [CytoDyn] or its subsidiary . . . You should

---

[74] JX102; JX104.0001.

[75] JX175.

[76] Compl. ¶ 22. Under Section 2(a)(2) of the Bylaws, nomination notices were required to be received between 90 to 120 days before the Annual Meeting, which is set to occur on October 28 of this year. JX017.0001.

[77] JX175.0001–0222.

also include any direct or indirect remuneration from [CytoDyn] or any "subsidiary" to you . . . .[78]

Patterson responded by disclosing the existence and monetary terms of the Consulting Agreement and a license and supply agreement between CytoDyn and IncellDx involving certain patent rights.[79] According to his response, he received approximately $90,000 from CytoDyn under the Consulting Agreement, and as of June 24, 2021, IncellDx had purchased $4,500 worth of PA-14 and PRO 140 under the license and supply agreement.[80] Patterson, however, elected not to disclose that IncellDx had made a proposal to CytoDyn the year before to be acquired for as much as $350 million.[81]

The questionnaire also asked about the nominees' control over business entities and whether there were anticipated transactions between any of those entities and CytoDyn. Patterson's answers are noted in bold:

B6. Do you control, either directly or indirectly, any [such] entities?[82]
**X No.**[83]

---

[78] JX175.0143.

[79] JX175.0144.

[80] JX175.0145

[81] JX025.0003–0017; Beaty Dep. 73:23–74:3.

[82] JX175.0146.

[83] *Id.*

22

B7. Can you exert significant influence, either directly or indirectly, over any entities, to the extent that the entity may be prevented from fully pursuing its own separate interests with regard to any transaction with [CytoDyn] and its affiliates? A relationship that meets this level of influence should be identified even if there are no current or anticipated transactions between the entity and [CytoDyn] and its affiliates.[84]
**X No.**[85]

F7. Are you or an "immediate family member" a partner in, or a "controlling" shareholder or an "executive officer" of, any entity to which [CytoDyn] made, or from which [CytoDyn] received, payments for property or services in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000, whichever is greater, other than (i) payments arising solely from investments in the [CytoDyn]'s Securities; or (ii) payments under non-discretionary charitable contribution matching programs?[86]
**X Yes. CEO of IncellDx which has had business dealings with [CytoDyn] as described in the response to Question B1.**[87]

F.14 Do you have any relationship that could interfere, or be viewed by third parties as interfering, with your exercise of independent judgment in carrying out your responsibilities as a director?[88]
**X No.**[89]

---

[84] *Id.*

[85] *Id.*

[86] JX175.0156–0157.

[87] JX175.0157.

[88] *Id.*

[89] *Id.*

23

Again, Patterson did not disclose the prior IncellDx proposal or that a potential future transaction between CytoDyn or IncellDx was being considered by IncellDx insiders, as discussed below.

The questionnaire then required that the Proposing Persons identify those who support the nomination efforts. Specifically, as noted, Section 2(D)(ii) of the Advance Notice Bylaw requires, in part:

> [I]dentification of the names and addresses of other stockholders (including beneficial owners) known by any of the Proposing Persons to support nominations or other business proposal(s), and to the extent known the class and number of all shares of the Corporations' capital stock owned beneficially or of record by such other stockholder(s) or other beneficial owner(s) . . . .[90]

The Nomination Notice identified no such supporters. Indeed, the response to Section 9(A) of the Advance Notice Bylaw appears to have been intended to take the Board off the scent of any behind-the-scenes support:

> 9. (A) A description of all agreements, arrangements or understandings by and among any of the Proposing Persons and any other person (including with any Nominee(s), including any agreements, arrangements or understandings relating to any compensation or payments to be paid to any such Nominee(s)), pertaining to the nominations (which description shall identify the name of each other person who is party to such agreement, arrangement or understanding), and (B) identification of the names and addresses of other stockholders (including beneficial owners) known by any Proposing Person to support such nominations, and to the extent known the class and number of all shares of the Corporation's capital stock owned

---

[90] JX239.0002.

beneficially or of record by such other stockholder(s) or other beneficial owner(s).[91]

**X Except as otherwise disclosed in this Notice,[92] there are no arrangements or understandings among any Proposing Persons or between any Proposing Persons and the Nominees or any other person or persons pertaining to the nominations.[93]**

Surprisingly, CCTV's role was not identified, even in Rosenbaum's response to the following questions in the questionnaire:

A8. Is there any "arrangement" or understanding between you and any other person or persons pursuant to which you are receiving or may receive any compensation (including any non-cash compensation) for your candidacy as a director nominee or service as a director of [CytoDyn]?[94]
**X No.[95]**

B6. Do you control, either directly or indirectly, any entities?[96]
**X No.[97]**

---

[91] JX175.0010

[92] No "arrangements or understandings" are "otherwise disclosed in [the] Notice."

[93] *Id.*

[94] JX175.0089.

[95] *Id.*

[96] JX175.0092.

[97] *Id.*

## G. Defendants Reject the Nomination Notice

On July 7, 2021, the Board met to discuss the Nomination Notice but took no formal action.[98]  On July 20, 2021, having received no response from the Board, Plaintiffs filed a preliminary proxy statement with the SEC.[99]  Three days later, on July 23, the Board met again to discuss the Nomination Notice and authorized the transmittal of a letter to Plaintiffs rejecting the Nomination Notice (the "Deficiency Letter") for failure to comply with the Advance Notice Bylaw and federal securities regulations.[100]

On July 30, 2021, almost a full month after receiving the Nomination Notice, CytoDyn sent the Deficiency Letter to Plaintiffs.[101]  This was the Company's first formal communication with Plaintiffs since receiving the Nomination Notice.[102] Several deficiencies were identified, but chief among them were the failure to disclose the prior proposal that CytoDyn acquire IncellDx, Patterson's patent disputes with the Company, the intent to name Patterson as CMO of CytoDyn and

---

[98] JX185.0001.

[99] JX193.

[100] JX196.0001.

[101] JX201.

[102] Kelly Dep. 69:6–20, 156:18–25, 157:1.

26

the existence (much less the identity) of any supporters of the nominations, including

CCTV.[103]

Specifically, with regard to Patterson, the Deficiency Letter explained:

c. Question B6 asks whether Dr. Patterson controls any entities, either directly or indirectly. Dr. Patterson's response is "no," but it is clear that Dr. Patterson controls IncellDx as *both* its CEO and a significant stockholder (together with his wife, Dr. Patterson owns approximately 34% of IncellDx).[104]

d. Question B7 asks whether Dr. Patterson can exert significant influence over an entity, to the extent that such entity may be prevented from pursuing its own separate interests in a transaction with [CytoDyn]. Dr. Patterson's response is "no," but Dr. Patterson clearly exerts significant influence over IncellDx as *both* its CEO and a significant stockholder. In a potential transaction between [CytoDyn] and IncellDx, Dr. Patterson would be highly conflicted if he were serving on the [CytoDyn] board.[105]

i. Dr. Patterson's response to question F7 fails to specify that Dr. Patterson is a controlling stockholder of IncellDx. Together with his wife, Dr. Patterson owns approximately 34% of IncellDx; that substantial ownership stake, combined with his role as CEO and his relationship with IncellDx's directors, including Mr. Beaty, leads us to conclude that Dr. Patterson is IncellDx's controlling stockholder. This seems largely corroborated by Dr. Patterson's beneficial ownership disclosure, in which he identifies himself as beneficially owning shares that are directly owned by IncellDx.[106]

---

[103] JX201.0004.

[104] JX201.0005.

[105] JX201.0005–0006 (emphasis in original).

[106] JX201.0006

j. In his response to question F14, Dr. Patterson states that he has no relationships that could interfere with his independent judgement in carrying out his duties as a director. Again, Dr. Patterson fails to state that he is CEO and a significant stockholder in IncellDx, a company that has had a working relationship with [CytoDyn] in the past and has expressed interest in being purchased by [CytoDyn] in the future, as evidence by the May 22, 2020 proposal put forth by IncellDx . . . wherein [CytoDyn] was to acquire IncellDx for $350 million and Dr. Patterson was to become an employee of [CytoDyn].[107]

Moreover, Exchange Act Rule 14a-9 mandates that the Proposing Persons may not omit "to state any material fact necessary in order to make statements [in the Notice Letter] not false or misleading." In fact, the Notice Letter omits multiple facts that make it incomplete, false and misleading. For instance, the Notice Letter fails to discuss the prior relationship between one of the nominees, Dr. Patterson, who is the CEO of IncellDx, Inc., and [CytoDyn]. The Notice Letter does not state that: (i) [CytoDyn]'s consulting agreement with IncellDx was terminated by Dr. Patterson, (ii) in May 2020, IncellDx made a private offer to be purchased by [CytoDyn], which [CytoDyn] rejected because it was not in the best interest of [CytoDyn] and its stockholders, and (iii) Dr. Patterson attempted to patent certain uses of [CytoDyn]'s drug candidate, [L]eronlimab, as his own, which was rejected by the U.S. Patent and Trademarks Office. These facts make Dr. Patterson highly conflicted with respect to [CytoDyn] and are therefore material, and none of these material facts have been disclosed in the Notice Letter.[108]

With regard to CCTV, the Deficiency Letter explained:

[T]he Notice Letter omits the material fact that Mr. Rosenbaum formed an entity called CCTV Proxy Group, LLC . . . CCTV is the entity through which the Proposing Persons will ostensibly be managing and funding their proxy campaign, but the Notice Letter does not disclose

---

[107] JX201.0006–0007.

[108] JX201.0004.

28

the existence of CCTV, nor provide any information about which individuals control CCTV or where CCTV receives its funding.[109]

## H. The Parties Correspond Regarding the Deficient Nomination Notice

On August 11, 2021, Plaintiffs, through their legal counsel, responded to the Deficiency Letter (the "Response Letter").[110]  They claimed they had properly disclosed the requested information relating to Patterson, and they disputed whether IncellDx's prior proposal to be acquired or the patent dispute between CytoDyn and IncellDx were sufficiently material to require disclosure.[111]  As for CCTV, Plaintiffs maintained that the Advance Notice Bylaw did not require the disclosure of CCTV's funders.[112]  Nevertheless, Plaintiffs included a supplemental notice with the Response Letter containing additional information that purportedly cured any deficiencies and demonstrated their willingness to disclose all information needed to move forward with their nominees.[113]  Finally, Plaintiffs stated that if CytoDyn did not "honor" the Nomination Notice by August 18, 2021, they would initiate legal proceedings to compel compliance.[114]

---

[109] *Id.*

[110] JX211.

[111] JX211.0007.

[112] JX211.0008–0009.

[113] POB at 56.

[114] JX211.0020.

On August 18, 2021, CytoDyn responded via letter that the supplemental notice included with the Response Letter had not cured the deficiencies, and then declared that Plaintiffs did "not have the right to nominate any candidates for election as directors at the 2021 Annual Meeting."[115]

## I. Procedural History

CytoDyn beat Plaintiffs to the litigation punch. On August 5, 2021, after rejecting the Nomination Notice, CytoDyn filed suit in the United States District Court for the District of Delaware against Plaintiffs and their nominees for violations of the Securities and Exchange Act of 1934.[116] Just over a week later, on August 13, Plaintiffs filed an amended preliminary proxy in which they provided more detail regarding Patterson's prior acquisition proposal on behalf of IncellDx to CytoDyn, the nature of the patent dispute between the two companies, and the existence of CCTV and its financial backers.[117] Plaintiffs filed their definitive proxy statement on August 18.[118]

---

[115] JX216.0001.

[116] JX208.

[117] JX258.0023, JX258.0042.

[118] JX215.

Plaintiffs initiated this action on August 24, 2021.[119] They sought expedited scheduling, which the Court granted on September 2, 2021.[120] The parties ultimately agreed to dismiss the District Court action without prejudice, and then proceeded with expedited discovery in this case through September 20, 2021.[121] The Court convened a trial on a paper record on October 6, 2021, and received supplemental submissions from the parties regarding the standard of review on October 8, 2021. The matter was deemed submitted for decision that day.

## II. ANALYSIS

I begin with a brief exposition on the applicable standard of review. Upon concluding that enhanced scrutiny under *Blasius* is not justified here, I then consider the unambiguous terms of the Advance Notice Bylaw and the evidence of Plaintiffs' non-compliance with those terms. By a preponderance of the evidence, I conclude that Plaintiffs' Nomination Notice was deficient and there is no basis in equity to excuse the deficiency.[122] The verdict, therefore, is for Defendants.

---

[119] D.I. 1.

[120] D.I. 31.

[121] JX238.0002; D.I. 23.

[122] *See Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) (holding that "inequitable action does not become permissible simply because it is legally possible").

## A. The Applicable Injunction Standard and Standard of Review

As noted, Plaintiffs seek both declaratory and injunctive relief.[123]  As for the injunctive relief, through the briefing, it appeared the parties were disputing the precise nature of the equitable relief Plaintiffs were seeking.[124]  To the extent that question remains in dispute, it is clear Plaintiffs seek permanent, mandatory injunctive relief.  First, their prayer for remedies includes an order that would definitively allow Plaintiffs' Nominees to stand for election notwithstanding the Board's rejection of the Nomination Notice.[125]  This amounts to all of the injunctive relief Plaintiffs could hope to achieve through a final judgment on the merits.  That is permanent injunctive relief.[126]  Second, they seek an order that would require the

---

[123] Compl. ¶ 42.

[124] *E.g.*, DOB at 27 ("The relief they seek is purportedly preliminary, but their request amounts to a mandatory, permanent injunction that would award them all relief requested in connection with the 2021 annual meeting."); Pls.' Answering Br. in Supp. of Final Hr'g on the Merits ("PAB") (D.I. 55) at 44 ("Plaintiffs are not requesting, and have not requested, preliminary relief.").

[125] Compl. ¶ 42.

[126] *See, e.g.*, *Saba*, 224 A.3d at 976–77 ("There is a 'higher mandatory injunction standard where, instead of seeking to preserve the status quo as interim relief, [plaintiffs], as a practical matter, seek the very relief that they would hope to receive in a final decision on the merits.'" (quoting *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004)); *H.F. Ahmanson & Co. v. Great W. Fin. Corp.*, 1997 WL 305824, at *6, 12 (Del. Ch. June 3, 1997) (outlining the burdens imposed upon the movant who seeks permanent injunctive relief).

Board to do that which it does not wish to do—to place the Plaintiffs' Nominees on the ballot for the Annual Meeting.[127]  That is mandatory injunctive relief.[128]

Defendants argue that Plaintiffs cannot sustain their burden to prove any of the *prima facie* elements for permanent injunctive relief—that the merits of their claim are supported by the law and the preponderance of the evidence, that Plaintiffs would suffer irreparable harm absent the injunction, and that the balance of equities favors the award of injunctive relief.[129]  I need not dwell on irreparable harm or balance of the equities because I am satisfied Plaintiffs have failed to meet their burden to prove the merits of their claim.[130]

Turning to the merits, as noted, Plaintiffs argue the Court should analyze the Board's rejection of their Nomination Notice under the standard laid out in *Blasius*, while Defendants contend the analysis is purely contractual and that any review of

---

[127] Compl. ¶ 42.

[128] *C&J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1053–54 (Del. 2014) (observing that "[m]andatory injunctions" are orders of the court "requiring a party to take affirmative action," and holding that such relief "should only issue with the confidence of findings made after a trial or on undisputed facts").

[129] *H.F. Ahmanson & Co.*, 1997 WL 305824, at *6.

[130] *See N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 384 (Del. 2014) (observing that a permanent injunction is "an extraordinary form of relief" that requires a showing of "actual, rather than probable success on the merits").

fiduciary conduct should be conducted solely under the deferential business judgment rule.[131]  As explained below, I reject both approaches.

To reiterate, in *Blasius*, Chancellor Allen reasoned that "[a]ction designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and a shareholder . . . ."[132]  To account for that conflict, when the board acts "for the primary purpose of impeding the exercise of stockholder voting power," the board will "bear[] the heavy burden of demonstrating a compelling justification for such action."[133]  Over time, *Blasius* has been interpreted "as holding that director conduct intended to interfere with or frustrate shareholder voting rights is presumptively inequitable and will be invalidated, unless the directors are able to rebut that presumption by showing a compelling justification for their actions."[134]

---

[131] DOB at 5 ("No heightened scrutiny applies here; the business judgment rule attaches to the Board's decision . . . ."); *see Kallick v. SandRidge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013) (describing the business judgment rule as "as close to non-review as our law contemplates"); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010) ("When the business judgment rule applies, the board's business decisions 'will not be disturbed if they can be attributed to any rational business purpose.'" (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[132] *Blasius*, 564 A.2d at 660.

[133] *Id.* at 661.

[134] *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *8 (Del. Ch. Jan. 14, 1991); *MM Cos. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1128 (Del. 2003) (same); *Coster v. UIP Cos.*, 255 A.3d 952, 962 (Del. 2021) (same).

Plaintiffs maintain that *Blasius*'s "compelling justification" standard applies because the Board rejected their Nomination Notice and thereby seek to prevent CytoDyn's stockholders from exercising their franchise in the selection of their board of directors.[135] As Plaintiffs correctly observe, "when facing an electoral contest, incumbent directors are not entitled to determine the outcome for the stockholders. Stockholders elect directors, not the other way around."[136] By Plaintiffs' lights, *Blasius* applies as the default standard whenever a board of directors deprives the stockholders of their right to elect directors through the wrongful enforcement of an advance notice bylaw.[137]

Plaintiffs seek to extend *Blasius* beyond its intended limits. "*Blasius* does not apply in all cases where a board of directors has interfered with a shareholder vote."[138] Rather, "courts will apply the exacting *Blasius* standard sparingly, and only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter."[139] "For the

---

[135] Letter from Lisa Zwally Brown to the Court Regarding Standard of Review (Oct. 8, 2021) (D.I. 61) ("Brown Ltr."), at 2.

[136] *Pell v. Kill*, 135 A.3d 764, 769 (Del. Ch. 2016).

[137] Brown Ltr. at 2, 5.

[138] *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *9 (Del. Ch. Dec. 4, 2000).

[139] *In re MONY Gp. Inc. S'holder Litig.*, 853 A.2d 661, 674 (Del. Ch. 2004).

*Blasius* standard to be invoked, the challenged action had to be 'taken for the sole or primary purpose of thwarting a shareholder vote.'"[140]

Plaintiffs wisely have not argued that *Blasius* applies to the adoption of the Advance Notice Bylaws. They were adopted years before this putative proxy contest was conceived. And they serve an indisputably legitimate purpose.[141] Nor do Plaintiffs argue that the terms of this Advance Notice Bylaw are overtly unreasonable. Again, this is wise given that the terms comport with bylaws our courts have characterized as "commonplace."[142] Plaintiffs instead focus on the Board's application of the Advance Notice Bylaw following Plaintiffs' allegedly timely Nomination Notice. Even there, however, Plaintiffs cannot invoke *Blasius* in the absence of evidence that the Board's response was the product of "manipulative

---

[140] *Kallick*, 68 A.3d at 258 (citing *Blasius*, 564 A.2d at 662).

[141] *Saba*, 224 A.3d at 980 (observing that advance notice bylaws serve the laudable purposes of "permit[ing] orderly . . . election contests" and "provid[ing] fair warning to the corporation so that it may have sufficient time to respond to shareholder nomination").

[142] *Id.* ("Bylaws, including advance notice bylaws, are 'commonplace.'") (quoting *Gaggin v. Vermillion, Inc.*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011)); 2 Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 211.06[c], 7-24 (7th ed. 2021) ("Courts have since noted that advance notification bylaws are commonplace."); *see also Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228 (Del. Ch. 2007) (upholding bylaws that require advance notice be given "not less than 20 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting"); *Harbinger Cap. P'rs Master Fund I, Ltd. v. Nw. Corp.*, 2006 WL 572823 (Del. Ch. Feb. 23, 2006) (denying motion to expedite proceedings in a case challenging advance notice bylaw that required plaintiff "to identify its slate of proposed board candidates three months in advance of the meeting").

conduct."[143]   Thus, contrary to Plaintiffs' position, the Court will not draw upon

*Blasius* unless the evidence reveals the Board engaged in "manipulative conduct" in

responding to the Nomination Notice.[144]   As explained below, I do not see adequate

evidence of such conduct in this record to relieve Plaintiffs of their burden to

demonstrate compliance with terms of the Advance Notice Bylaw.

Defendants argue that because *Blasius* does not apply, I must default to the

deferential business judgment rule to the extent I determine it is necessary to evaluate

the conduct of the fiduciaries involved in the decision to reject the Nomination

Notice.[145]   Here again, the argument stretches basic propositions of our law too far.

Any question regarding the most "sacrosanct"[146] of stockholder rights—voting

power—must be viewed with an understanding of the "authority as between the

---

[143] *Saba*, 224 A.3d at 981 (reversing the trial court's determination that an incumbent board had "gone too far" in its efforts to thwart a dissident stockholder group's attempt to nominate a dissident slate of directors by imposing a requirement that the stockholder group respond to over-broad questions, and holding that the board's conduct should be measured under "contractual principles").

[144] *Id.* at 979–82.

[145] *See* Defs.' Pre-Trial Answering Br. ("DAB") (D.I. 56) at 20–21; Letter from Kevin R. Shannon to the Court Regarding Standard of Review (Oct. 8, 2021) (D.I. 62), at 6. Defendants point to *MONY*, 853 A.2d at 674–75 to support this argument.  There, the court observed, "courts will apply the exacting *Blasius* standard sparingly, and only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter and to thwart what appears to be the will of a majority of the stockholders . . .   Where such circumstances are not present, *the business judgment rule will ordinarily apply . . . .*"  *Id.* (emphasis added).

[146] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).

fiduciary and the beneficiary."[147]  When it comes to the enforcement of bylaws against stockholders, the board does not act simply as an arms-length contracting partner; board members are fiduciaries and, in the context of an advance notice bylaw, they are fiduciaries confronting a structural and situational conflict.[148]

With these principles in mind, the Delaware Supreme Court wrote 50 years ago in *Schnell* that "inequitable action does not become permissible simply because it is legally possible."[149]  It is emphatically the Court's duty to ensure that bylaws "afford the shareholders a fair opportunity to nominate candidates."[150]  Despite the limitations of *Blasius*'s reach, Delaware courts have reserved space for equity to address the inequitable *application* of even validly-enacted advance notice bylaws.[151]  "[T]he inquiry ultimately focuses on whether the by-law, *as applied in*

---

[147] *Blasius*, 564 A.2d at 658 (emphasis omitted).

[148] *See Loft, Inc. v. Guth*, 2 A.2d 225, 238 (Del. Ch. 1938), *aff'd*, 5 A.2d 503 (Del. 1939) ("It has frequently been said by this court . . . that the directors of a corporation stand in a fiduciary relation to the corporation and its stockholders."); *Pell*, 135 A.3d at 785–86.  I acknowledge that, according to Defendants, "three of the six directors who unanimously voted to reject the Nomination Notice are not running for re-election, and therefore had nothing to gain by their vote."  DAB 5–6.

[149] *Schnell*, 285 A.2d at 439.

[150] *Hubbard*, 1991 WL 3151, at *11.

[151] *AB Value P'rs, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014) ("[T]hose cases enjoining advance notice bylaws are context-specific applications of the Delaware Supreme Court's opinion in *Schnell* . . . and its oft-quoted statement that 'inequitable action does not become permissible simply because it is legally possible.'") (citing *Schnell*, 285 A.2d at 439); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations*, § 7.9, 7-35 (3d ed. 2021)

*these circumstances*, has afforded the shareholders a fair opportunity to nominate director candidates."[152]  Any attempt to "utilize the corporate machinery and the Delaware Law for the purpose of perpetuating [oneself] in office" by "obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest"  must be denied because those are "inequitable purposes, contrary to established principles of corporate democracy."[153]

Indeed, even though the parties vigorously dispute whether *Blasius* applies here, when pressed, defense counsel readily acknowledged that overarching equitable principles, flowing from *Schnell*, are very much in play.[154]  Thus, while the burden may not lie with Defendants to prove a "compelling justification" for their rejection of the Nomination Notice under *Blasius*, Plaintiffs may still turn to

---

("The application of certain by-law provisions requiring advance notice of nominations or business has been found to have been inequitable in specific factual circumstances.").

[152] *Hubbard*, 1991 WL 3151, at *11 (emphasis supplied).

[153] *Schnell*, 285 A.2d at 439.

[154] Trial Tr. 72:9–15 (in response to the Court's inquiry: "Mr. Stern: Your Honor, I think *Schnell* is an overarching principle that does apply.  I will not argue to the Court that the Court shouldn't be considering *Schnell*.  The notion that, you know, whether the conduct is equitable or not doesn't matter, I know we're in a court of equity, and I think that's always a guiding principle.").  *See also In re Investors Bancorp, Inc.*, 177 A.3d 1208, 1222 (Del. 2017) (holding that fiduciary conduct is always "twice-tested, first for legal authorization, and second by equity") (internal quotation marks omitted).

equity for relief by proving there are "compelling circumstances" that justify a finding of inequitable conduct.[155]

## B. The Application of Contractual Principles and *Schnell*

Notwithstanding their acknowledgement that *Schnell* applies, Defendants are quick to remind the Court that it must strictly construe the Advance Notice Bylaw in order to stay true to Delaware's highly contractarian public policy.[156] To be sure, the canons of contract construction apply when construing bylaws,[157] as "bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers, and stockholders formed within the statutory framework of the DGCL."[158] Defendants again point the Court to *Saba* for guidance as the Court

---

[155] *AB Value P'rs, LP,* 2014 WL 7150465, at *5. *See also Hill v. Int'l, Inc. v. Opportunity P'rs LP*, 119 A.3d 30, 38 (Del. 2015) (noting that, given the quintessential importance of corporate democracy, Delaware law will "resolve any doubt" as to the proper application of bylaws "in favor of the stockholder's electoral rights"). To be clear, if the evidence reveals that a board has applied lawfully adopted advance notice bylaws in an inequitable fashion, clamors of "strict compliance" and "business judgment rule deference" will not prevent this court from exercising its equitable powers in defense of the franchise.

[156] *E.g., Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *4 (Del. Ch. Jan. 28, 2020) ("Delaware is a pro-contractarian state.") (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 WL 3201139, at *26 (Del. Ch. Aug. 7, 2012)).

[157] *Saba*, 224 A.3d at 980 ("Bylaws . . . are interpreted using contractual principles."); *Hill Int'l Inc.*, 119 A.3d at 38 ("Because corporate charters and bylaws are contracts, our rules of contract interpretation apply.").

[158] *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013).

orients itself to undertake the contract construction exercise in this case.[159] There, the Court determined that the bylaw at issue was unambiguous and held the plaintiff stockholders to account for their failure to comply with the letter of the bylaw.[160] In doing so, the Court rejected plaintiffs' attempt to "proffer after-the-fact reasons for their non-compliance."[161]

Plaintiffs counter that they missed no deadlines here.[162] They submitted their Nomination Notice on time and stood ready to engage with the Board to address any perceived shortcomings. The Board refused to engage. Instead, it intentionally allowed the Nomination Notice to languish before hitting Plaintiffs with the Deficiency Letter in which the Board outlined deficiencies almost too numerous to count. This, say Plaintiffs, is all the Court needs to invoke *Schnell* as a basis to override the Board's rejection of the Nomination Notice.[163] But there is more to the evidentiary picture; Plaintiffs ignore the fundamental nature of the materially deficient disclosures in their Nomination Notice.

---

[159] *Saba*, 224 A.3d at 977–81.

[160] *Id.* at 979.

[161] *Id.* at 980.

[162] PAB at 20–21.

[163] *Id.* at 10–16.

Before turning to the deficiencies, it is useful to explore the context in which the Nomination Notice was submitted and then considered by the incumbent Board. As they prepared their Nomination Notice, Plaintiffs were focused on the clear admonition in the Advance Notice Bylaw that "[i]f the Board of Directors . . . determines that any stockholder proposal or nomination was not made in accordance with the provisions of this By-law, such proposal or nomination shall be disregarded and shall not be presented for action at the meeting."[164]  Plaintiffs also well understood the deadline.[165]  Unlike many advance notice bylaws,[166] the Advance Notice Bylaw at issue here provided no express process by which a stockholder

---

[164] JX017.0003; JX061.0001 (Rosenbaum's email to stockholders: "It is crucial to strictly follow all of these procedures because if it determined by the Board . . . that 'any stockholder proposal or nomination was not made in accordance with the provisions of this By-law, such proposal or nomination shall be disregarded and shall not be presented for action at the meeting.'") (citing the Bylaws at JX017.0003).

[165] JX058.0001; JX061.0003–0004; JX017.0001.

[166] *See, e.g.*, *Saba*, 224 A.3d at 974–78 (explaining the detailed cure process provided for by the advance notice bylaw at issue).

could cure a deficient notice.[167]  Yet Plaintiffs inexplicably elected to submit their Nomination Notice on the eve of the deadline.[168]

Had Plaintiffs submitted their Nomination Notice well in advance of the deadline, they might have a stronger case that the Board's prolonged silence upon receipt of the notice was evidence of "manipulative conduct."[169]  Although the Bylaws do not explicitly provide for an iterative process by which a stockholder can cure a deficient nomination notice, the Board certainly would have a harder time

---

[167] Plaintiffs argue that the Bylaws expressly endorse an iterative process following the stockholder's submission of the nomination notice, pointing to Sections 2(a)(2), 2(a)(2)(A), and 2(a)(3).  But those provisions do not support Plaintiffs' contention. Section 2(a)(3) requires the stockholder to "further update and supplement such notice, if necessary, so that the information . . . shall be true and correct."  JX017.0002. This places an obligation on the stockholder to correct and update the information provided in the notice as the Annual Meeting approaches; it does not impose an express duty on CytoDyn's Board to reach out to the stockholder to cure deficiencies.  Next, Section 2(a)(2) concerns the proper *timing* of a nomination notice and any supplements.  It demands, in part, that a stockholder timely provide "any updates or supplements to [their nomination] notice at the times and in forms required by this By-law."  JX017.0001.  Here again, this language imposes obligations on the nominating stockholder, not the Board.  Finally, Section 2(a)(2)(A) provides "that the Corporation may require any proposed nominee to furnish such other information as the Corporation may reasonably require to determine the eligibility of such proposed nominee to serve as a director of the Corporation."  *Id.* This provision allows CytoDyn's Board to ask for additional information after the filing of a nomination notice to assist in its determination of the eligibility of a nominee to serve as a director, as occurred in *Saba*.  *See Saba*, 224 A.3d at 969.  Here, however, because Plaintiffs failed to provide *any* disclosure regarding their supporters and certain material ties to IncellDx, it cannot be argued that the Board was obliged to seek clarifying or additional information concerning the proposed candidates, as there was no information to clarify or augment.

[168] JX175.

[169] *Saba*, 224 A.3d at 981.

43

justifying its silence in the face of its fiduciary duties when, upon receipt of a deficient nomination notice, ample time remained before the arrival of the notice deadline.[170]   Of course, that is not what happened here.   Plaintiffs filed their Nomination Notice just before the deadline with full understanding of the consequences of doing so and without any assurance in the unambiguous terms of the Advance Notice Bylaw that the Board would be required to engage with them beyond the deadline.[171]   Given that Plaintiffs waited until the last minute to submit their Nomination Notice, they were obliged to submit a compliant notice.   They did not do so.

## C. The Nomination Notice's Failures

The Nomination Notice was deficient in at least two key respects.   First, it did not disclose who was supporting Plaintiffs' proxy contest.   Second, it did not

---

[170] *Cf. In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64, 66 (Del. 2006) (defining bad faith a few different ways, including "fiduciary conduct motivated by an actual intent to do harm" and an "intentional dereliction of duty, a conscious disregard for one's responsibilities").

[171] *See Openwave Sys. Inc.,* 924 A.2d at 238–39 (noting that deadlines in advance notice bylaws "function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations"); *Saba*, 224 A.3d at 980 ("A rule that would permit election-contest participants to ignore a clear deadline and then, without having raised any objection, proffer after-the-fact reasons for their non-compliance with it, would create uncertainty in the electoral setting. Encouraging such after-the-fact factual inquiries into missed deadlines could potentially frustrate the purpose of advance notice bylaws, which are designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations.") (internal quotation marks omitted).

disclose that Patterson might seek to facilitate a future IncellDx/CytoDyn combination if seated on the Board. The prospect that a nominee may seek to facilitate an insider transaction is the type of potential conflict that stockholders are entitled to know about when voting for directors.

### 1. CCTV and "Supporters"

The Board rejected the Nomination Notice, in part, because it failed to disclose the existence of CCTV, which was founded by Rosenbaum and collected donations to support the proxy fight.[172] Plaintiffs argue they were not obliged to disclose the role of CCTV and its funders under the Advance Notice Bylaw because "Plaintiffs' slate of Nominees was not disclosed to the so-called 'Gifting Persons'" at the time they made their donations.[173] The Advance Notice Bylaw requires information regarding those known to "support" the "nominations" through "all agreements, arrangements or understandings."[174] According to Plaintiffs, Rosenbaum collected funds for CCTV *before* a candidate slate was identified, and so, by definition, the purpose of the contributions could not be to "support" the "nominations" because those nominations were not yet known. Thus, the argument

---

[172] JX201.0004.

[173] PAB at 5. Plaintiffs define "Gifting Persons" in their Amended Preliminary Proxy as "[c]ertain stockholders of the Company" who "have gifted money to CCTV in connection with its preliminary activities." JX258.0023.

[174] JX017.0002.

goes, Plaintiffs "had no basis to know if the Gifting Persons would support one or more of their Nominees" because donors were "entirely free to support whomever they want."[175]  In other words, there were no "supporters" to disclose.

This argument fails on several grounds.  *First*, Plaintiffs' explanation for the non-disclosure is refuted by a common-sense reading of the Advance Notice Bylaw's language.  By answering "no" to the question of whether anyone supports the nominations, Plaintiffs essentially were advising the Company and its stockholders that they had no support or funding for their proxy campaign.  Upon receiving this facially disingenuous response, the Board would be reasonable in concluding that Plaintiffs were purposefully trying to hide who was behind the scenes supporting their efforts.[176]  Had Plaintiffs at least paid lip service to the fact that their proxy campaign was receiving outside support, they might have a stronger argument that the Board should have sought clarification or more details.  But Plaintiffs said nothing, choosing instead to rest on a strained reading of the Advance

---

[175] PAB at 5.

[176] *See* Beaty Dep. 201:21–22 (discussing how IncellDx, among others, supported the campaign by paying certain legal fees).

46

Notice Bylaw and a misplaced hope that equity would ride to the rescue should the Board call them out on the woefully deficient disclosure.[177]

*Second*, the canon of construction resolving ambiguities in bylaws in favor of stockholders' rights does not save Plaintiffs' omission.[178] There is no ambiguity in the Advance Notice Bylaw at issue. The definition of "supporter" proposed by the Defendants is not odd or technical, but common-sense. Rather, it is the Plaintiffs' proffered (and apparently litigation-driven) construction that would have the Court interpret the Bylaw in a way that stretches credulity.[179]

*Third*, the evidence reveals that at least some of the nominees were known to supporters of the proxy contest before they contributed and before the Nomination Notice was sent to the Board. An email from CytoDyn stockholder,

---

[177] *See* JX061.0002–0003 (revealing that Rosenbaum was focused on the need to disclose "agreements, arrangements, or *understandings*, by and among any Proposing Person and *any other person* 'pertaining to the nomination'" (emphasis in original)).

[178] *E.g.*, 2 Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 211.06, 7-25 (7th ed. 2021) ("To the extent there is any ambiguity in an advance notification bylaw, courts resolve the ambiguity in favor of the stockholders' electoral rights."); *Openwave Sys. Inc.*, 924 A.2d at 239 ("If the language is found to be ambiguous, doubt is resolved in favor of the stockholders' electoral rights.").

[179] I say "litigation driven" because Plaintiffs themselves seem to understand that funding a proxy contest is tantamount to "supporting" that proxy contest. *See, e.g.*, Staats Dep. 81:3–9 (Q: "As far as you are aware, members of the 13D group and the Gifting Persons support the proxy fight?" . . . A: "That's correct."); Errico Dep. 112:13–14 ("support to me meant contribute funds"); Rosenbaum Dep. 184:13–85:7 (Q: "When you submitted the nomination notice . . . did you have an understanding at that time whether [Caracciolo and Pestell] supported your proxy campaign?" A: "I am assuming yes. Why wouldn't they?" . . . Q: "And they gifted money to support the campaign?" A: "Yes.").

Glenn Eisenberg, dated May 7, 2021, explained the plan to wage a proxy contest and replace certain members of management with "Dr. Bruce Patterson and Devon Williams."[180] An email from Rosenbaum to a large shareholder proclaimed, "Dr[.] Bruce Patterson will head up our slate."[181] While it may be that not all of the nominees were known by all of the dissident stockholder group or the Gifting Persons, even under Plaintiffs' strained construction, the evidence reveals that some "supporters" were, in fact, supporting specific nominees. This information was in hand when Plaintiffs submitted their Nomination Notice, yet they deliberately chose not to disclose it.[182]

*Finally*, endorsing Plaintiffs' proffered construction would foment bad policy. As stated above, advance notice bylaws are commonplace, and provisions asking stockholders to disclose supporters are equally ubiquitous.[183] If a nominating

---

[180] JX076.0001. Eisenberg was later disclosed to be a Gifting Person. JX235.0003.

[181] JX270.0001 (emphasis omitted).

[182] *See* JX270.0002; JX087.0001; JX243; Rosenbaum Dep. 44:16–22.

[183] *E.g.*, Moderna, Inc., Registration Statement (Form S-1) (Oct. 9, 2018); Intellia Therapeutics, Inc., Quarterly Report (Form 10-Q) (May 7, 2020); Citrix Sys., Inc., Annual Report (Form 10-K) (Feb. 14, 2020); Caladrius Biosciences, Inc., Current Report (Form 8-K) (Sept. 21, 2017); Health Catalyst, Inc., Registration Statement (Form S-1) (July 12, 2019); Jetblue Airways Corp., Proxy Statement (Form Def 14A) (Apr. 3, 2020); *see also* Lawrence A. Hamermesh, *Director Nominations*, 29 Del. J. Corp. L. 117, 141–42 (2014) ("Advance notice bylaws also frequently contain an informational component . . . In their 'early' form (through the 1980s, at least), advance notice bylaws required submission of the information that would be required under the federal proxy rules to be included . . . [A]dvance notice bylaws have come to require a submission of a number of additional informational matters, and even substantive representations and agreements,

stockholder did not have to disclose her supporters so long as the exact nominees were not known at the time funds to finance the proxy contest were solicited, then such bylaw provisions would be rendered useless. To avoid disclosure, stockholders would enlist supporters but deliberately delay naming their formal slate until just before they submitted their nomination notice. Delaware law counsels against constructions that would facilitate such perverse incentives.[184]

Plaintiffs were obliged to identify their supporters.[185] This was vitally important information; the Board was not nitpicking when it flagged the omission as material and ultimately disqualifying.[186] Rosenbaum was focused on this disclosure requirement and emphasized it to others in the dissident stockholder group before the Nomination Notice was submitted.[187] Yet Plaintiffs elected to say nothing of supporters, preferring instead to withhold the information based on an unreasonable interpretation of their disclosure obligations under the Advance Notice

---

such as: . . . Responses to a questionnaire, presumably prepared by management or the board of directors but with content not specified in the bylaw . . . .").

[184] *E.g., Horizon Personal Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *21 (Del. Ch. Aug. 4, 2006) (stating that this Court "strives to avoid . . . interpretations" that produce "absurd result[s]"); 11 Williston on Contracts § 32:11 (4th ed. 2021) ("The words of a contract should be given a reasonable meaning rather than an unreasonable one . . . .").

[185] *See* JX017.

[186] Indeed, Section 14(a)-101 of the Exchange Act requires disclosure of "persons who the cost of solicitation has been or will be borne, directly or indirectly."

[187] *See* JX061.0002–0003.

Bylaw. Having provided no information on the subject, there was no basis for the Board to seek supplementation. Under these circumstances, the Board was justified in rejecting the Nomination Notice and refusing to recognize Plaintiffs' Nominees on this basis alone.[188]

## 2. IncellDx

The Board rejected the Nomination Notice, in part, because it did not disclose the possibility that Plaintiffs' Nominees would propose that CytoDyn revisit its decision to pass on the acquisition of IncellDx.[189] The Board members were keenly aware of the rejected proposal and reasonably believed that a future transaction

---

[188] Although not entirely clear, it appears Plaintiffs argue the Court must undertake a nominee-by-nominee analysis when assessing the sufficiency of the Nomination Notice. *See* POB at 56; PAB at 27. While this argument was not meaningfully pressed at trial, I address it briefly here. First, I note that Plaintiffs cite no authority for the proposition that a Board must dissect a facially deficient nomination notice to ascertain whether parts of it, with respect to individual nominees, might pass muster. The cases they cite for the proposition do not say that. POB at 56. On the other hand, Defendants cite no authority for the counter-proposition–that the Board can justify rejecting a notice of one nomination based on deficiencies in the notice with respect to another nomination (in this case, deficient disclosures regarding one nominee that do not apply to other nominees). While the law is not at all developed on this point, I think Plaintiffs have the better of the argument. The Board is obliged to review a nomination notice carefully and with an open mind. Just because it finds disclosures inadequate with respect to one nominee, that does not mean, or justify a finding, that the entire notice is deficient. Even so, with respect to the issue of supporters, the Nomination Notice failed to provide information regarding supporters for *any* of the Plaintiffs' Nominees. *See* JX175.0008–0010. This fundamental failure affects the viability of each of their candidacies and justified the Board's rejection of the entire Nomination Notice.

[189] JX196.

50

between CytoDyn and IncellDx could be on the horizon should the dissident stockholder group gain control of the Board.[190]

In response, Plaintiffs argue that (1) the past proposal for CytoDyn to acquire IncellDx did not need to be disclosed because there was no consummated transaction, as the Board was well aware, and (2) they did not need to disclose that a future transaction might be facilitated by Plaintiffs' Nominees because, in fact, no such transaction is being contemplated by Plaintiffs or Plaintiffs' Nominees.

Plaintiffs, again, would have the Court focus on only part of the picture. I accept as fact that a reasonable stockholder would want to know that certain of Plaintiffs' Nominees were tied to a past proposal whereby CytoDyn would acquire IncellDx for nearly $350 million. She also would want to know that this nominee may seek to facilitate a renewed proposal along the same lines as the previously rejected proposal before casting her vote in an election where potentially conflicted nominees were on the ballot.[191] Any future acquisition of IncellDx likely would not

---

[190] JX052.0002; JX201.0004–0006; JX202.0005–0007; JX089.0002 ("Bruce Patterson's agenda is to get [IncellDx] aquired [sic] and nothing more."); Kelly Dep. 77:1–7 ("Bruce Patterson was trying to have our company buy his company of IncellDx, but failed to disclose that for shareholders when it was [$]150 million up front and $200 million in milestones. And Jeff Beaty was involved in it as well.").

[191] On this front, I decline to lump Plaintiffs' Nominees together because the preponderance of evidence suggests that only one of the Plaintiffs' Nominees had any connection to IncellDx. I gather the Board operated on the assumption that Rosenbaum and Patterson had assembled a slate of nominees who would support the initiatives they cared about, including a potential IncellDx/CytoDyn combination. Their supposition in this regard is understandable. *See* JX052 (stockholder email to CytoDyn endorsing, among other things,

51

be subject to a stockholder vote, so the directors could approve it unilaterally.[192]

Stockholders would want to know that when deciding how to vote their shares.[193]

Plaintiffs make two arguments in response. First, the Board cannot justify its rejection of the Nomination Notice on facts it did not know when it sent the Deficiency Letter. Second, the Board cannot justify its rejection on misplaced facts;

---

renewed negotiations with IncellDx). But the credible evidence reveals that only Patterson (nominee) and Beaty (nominating person) have ties to IncellDx that would oblige them to disclose material information regarding the potential conflict arising from the failed attempt at an IncellDx/CytoDyn transaction and the possibility of a future attempt to revive that transaction. *See* JX175.0140 (Patterson questionnaire disclosing he is CEO of IncellDx and IncellDx board member); JX175.0144 (Patterson disclosing that he and his wife collectively own 33.04% of IncellDx's outstanding common stock); Beaty Dep. 24:18–25:1 (Beaty testifying he is an IncellDx stockholder and board member). The other nominating persons (Rosenbaum and Wilmes), and the other nominees (Rosenbaum, Yeager, Errico, and Staats), have no demonstrable ties to IncellDx, and each adamantly denied any connection with IncellDx or intent to see an IncellDx/CytoDyn transaction happen in the future. *See* Rosenbaum Dep. 149:23–154:8; Yeager Dep. 122:16–123:23, 125:14–24; Errico Dep. 99:13–102:11, 106:22–110:15; Staats Dep. 96:19–105:23. While there is room to question Rosenbaum's denial of support for a future IncellDx/CytoDyn combination, *see* JX078.0001 (Rosenbaum forwarding email, dated May 27, 2021, endorsing future IncellDx/CytoDyn combination); Rosenbaum Dep. 165:1–168:19 (explaining that while he does not recall forwarding JX078, he sees nothing "wrong with" Patterson endorsing a future IncellDx/CytoDyn combination should he be seated on the CytoDyn Board), it is difficult to discern where the Advance Notice Bylaw, or the associated questionnaire, would require Rosenbaum to say anything in the Nomination Notice about IncellDx.

[192] *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (observing that a corporation's determination to acquire another corporation generally is not required to be submitted for shareholder approval under the DGCL).

[193] *See Louden v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) ("An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote.").

52

contrary to the Board's supposition, none of the Plaintiffs' Nominees have any intent to propose an acquisition of IncellDx now or down the road.

As for the first argument, I agree. The Board cannot base its decision to reject the Nomination Notice on after-discovered facts. But that is not what happened here. The Board legitimately suspected that Patterson and others were keen on revisiting the failed attempt to combine IncellDx and CytoDyn.[194] More to the point, the Board was correct in expecting that Patterson and Beaty would disclose the past failed proposal and their intentions, one way or the other, with respect to a future IncellDx/CytoDyn transaction, particularly given the obvious ties between them and IncellDx. For Plaintiffs not to appreciate the presence of that elephant in the room reflects either reckless indifference or deliberate gamesmanship.

As for the evidence corroborating the Board's suspicion, while the IncellDx board minutes do not reflect any discussions at the board level regarding an acquisition by CytoDyn,[195] other evidence clearly reveals that such a transaction was at least being contemplated by the IncellDx insiders and Rosenbaum. CytoDyn stockholder, Glenn Eisenberger, emailed other interested stockholders to discuss the proxy contest and recounted how Patterson had acknowledged he would consider a

---

[194] JX052.0002; JX089.0002; JX201.0004–0006; JX202.0005–0007; JX225.0001; Kelly Dep. 77:1–7.

[195] JX265.

53

CytoDyn/IncellDx merger post-election.[196]  Another email chain reveals that Patterson continues to believe that a merger would be in the best interests of both companies; he writes: "it HAS to happen solely because of our IP.  We haven't made a big deal about it because we view the 13D as an opportunity to bring this together in a 1+1=3 scenario."[197]  In yet another email, Patterson declares, "The takeover is starting!," and then explains, "Yes this is the beginning of getting the deal I sent to you consummated!!"[198]

I express no opinion on the desirability of a CytoDyn/IncellDx transaction. Indeed, the combination may well be beneficial for both companies.  But, as factfinder, I do have a view of whether information relating to the possibility of a future transaction would be material to stockholders.  It would be.  And the Nomination Notice failed to provide that information with respect to a conflicted

---

[196] JX076.0001.  During trial, Plaintiffs lodged an objection to this exhibit on the ground that the email is inadmissible hearsay.  Trial Tr. 144:4–17.  I disagree.  The exhibit is offered to reveal the declarant's then-existing state of mind.  *See* DRE 803(3).  Moreover, the exhibit is offered to impeach Patterson's evasive testimony regarding his intentions with respect to a future transaction.  *See, e.g.*, Patterson Dep. 132:6–13 ("Q. As you sit here today, do *you* think there is still potential for IncellDx to become the R&D engine for CytoDyn? . . . [Patterson]: There's been no discussion of that.") (emphasis supplied); Patterson Dep. 134:7–11 ("Q. Is it part of the plan if you win the proxy contest to do a transaction with IncellDx? A. Never been discussed . . ."); Patterson Dep. 135:4–10 ("Q. If you win the election, do *you* plan to cause IncellDx and CytoDyn to collaborate in any way?" . . . [Patterson]: There hasn't been any discussion in that regard.") (emphasis supplied).

[197] JX187.0001.

[198] JX177.0001.

nominee and a conflicted Proposing Person despite being required to do so. In that regard, it was deficient.

*   *   *   *   *

While I acknowledge that Plaintiffs submitted a supplement to the Nomination Notice soon after the Board sent its Deficiency Letter,[199] and then supplemented their proxy filings with certain information omitted from the Nomination Notice,[200] the effort came too late.[201] The fundamental nature of the omissions, and the "eve of" timing of the Nomination Notice's submission, leave no room for *Schnell*-inspired equitable principles to override the decision by the Board to reject the Nomination Notice. Even though the Board delayed in responding to the Nomination Notice, given the nature of the omissions, they rejected it on reasonable grounds. There was no manipulation; there was no inequitable conduct.

---

[199] JX205.

[200] JX213.

[201] *See Bay Cap. Fin., L.L.C. v. Barnes & Noble Educ., Inc.*, C.A. No. 2019-0539-KSJM, at 8 (Del. Ch. Aug. 14. 2019) (TRANSCRIPT) (denying a motion for summary judgement on the ground that, "[n]ot even Delaware's strong public policy favoring the stockholder franchise will save Bay Capital from its dilatory conduct. Bay Capital blew the deadline. It then made up excuses for doing so. No record evidence suggests that the company is in any way at fault for that mistake. If this Court required the company to accept the nomination in these circumstances, advance notice requirements would have little meaning under Delaware law.").

The failures with respect to disclosing support for the nominations cut across the entire Nomination Notice and justified the Board's rejection of the notice in its entirety. Separately, the failure to disclose information regarding the failed IncellDx/CytoDyn transaction, and the intent of a conflicted Proposing Person (Beaty) and a conflicted nominee (Patterson) with respect to a future IncellDx/CytoDyn transaction, justified the Board's rejection of the Nomination Notice with respect to Patterson, but not the other nominees.

## III. CONCLUSION

Because Plaintiffs have not succeeded on the merits of their claim, their request for declaratory and permanent, mandatory injunctive relief must be DENIED. Final judgment is entered for Defendants.

**IT IS SO ORDERED**.